UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**SEAN ALAN O'BRIEN,**
    Petitioner/Appellant,                **Ninth Circuit No. 20-16970**

        vs.                     D.C. No. 2:10-CV-02472-MCE

**KEN CLARK,**
    Respondent/Appellee.
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾/

# APPELLANT'S OPENING BRIEF

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
CHIEF JUDGE MORRISON C. ENGLAND Jr.

DAVID A. NICKERSON
California State Bar # 111885
5 Astor Circle
Santa Fe, New Mexico 87506
Telephone: (505) 954-1942
Nickersonlaw@comcast.net

Attorney for Appellant
SEAN ALAN O'BRIEN

# TABLE OF CONTENTS

I.     QUESTIONS PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . 2

III.   APPELLANT'S BAIL STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V.     STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Certified Claim:*

VI.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE . . . 5

       A.    Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       B.    The Evidence Presented at Trial . . . . . . . . . . . . . . . . . . . . . 8

       C.    The Second Day of Trial and the Hoagland Report . . . . . . . . 14

       D.    The Evidence That Clark Could and Should Have
             Presented at Trial In Support of O'Brien's Alibi . . . . . . . . . . 17

             1.    Robert Gilmore . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

             2.    Edward Winslow  . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

             3.    O'Brien Did Not Have a Cell Phone and Made
                   No Calls in Wellman's Presence  . . . . . . . . . . . . . . . . 26

                   a.    O'Brien Made No Telephone Calls in
                         Wellman's Presence . . . . . . . . . . . . . . . . . . . . . 26

b.     O'Brien Did Not Have or Use a Cell Phone . . . . 31

4.     Travel Routes and the Alleged "Gap"
in O'Brien's Alibi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5.     The 11:14 Telephone Call to Mike Carrick . . . . . . . . . . 39

6.     Carrick's ATM Thefts and the Money Used
to Buy Marijuana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

7.     Wellman Admitted He Committed Perjury
at O'Brien's Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

E.     Competent Counsel Would Have Established That It
Was "Virtually Impossible For O'Brien to Have Committed
the Murder...Given the Location of the Murder and
the State's Theory as to When It Took Place" . . . . . . . . . . . . 62

VII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . 67

NOTICE OF RELATED CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

# TABLE OF AUTHORITIES

**CASES**

                                                          **PAGE**

<u>Federal</u>

*Cannedy v. Adams,* 706 F.3rd 1148 (9th Cir. 2013) . . . . . . . . . . . . . . . . 6, 7, 9

*Hardy v. Chappell*, 832 F.3rd 1128 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . 6

*Melendez v. Pliler*, 288 F.3rd 1120 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 3

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . 3


<u>State</u>

*People v. Trujeque* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**STATUTES**

28 U.S.C. section 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. section 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**SEAN ALAN O'BRIEN,**
          Petitioner - Appellant,          No.   20 - 16970

          vs.

**KEN CLARK,**
          Respondent -Appellee.
                              /

**APPELLANT'S   OPENING   BRIEF**

**I.**
**QUESTION  PRESENTED**

*Certified Question:*

This appeal is *O'Brien II*.  The Court decided *O'Brien I (O'Brien v. McEwen*, Ninth Circuit No. 14-15753) in 2015 when it issued a memorandum opinion remanding this habeas case to the district court for an evidentiary hearing.  In *O'Brien I* this Court concluded that "the district court could not reject (O'Brien's) ineffective assistance of counsel claim without holding an evidentiary hearing."  The evidentiary hearing was held in the district court in 2017.  Thereafter, in 2020, the district court denied O'Brien's habeas petition.

In *O'Brien I*, this Court stated that O'Brien's petition had "alleged facts that, if accepted as true, showed that trial counsel failed to introduce available evidence that would have significantly strengthened O'Brien's defense." (The Court's memorandum opinion is set forth in the Excerpts of Record at pp. 35-45. (ER-39.)  The remand to the district court was to provide O'Brien the opportunity to present that evidence.  He did.  Nevertheless, the district court denied the petition.  The question now before this Court in *O'Brien II* is whether or not O'Brien presented at the evidentiary hearing in the district court the evidence which was readily available to defense counsel at the time of trial, but which defense counsel failed to present.

## II.
## STATEMENT OF JURISDICTION

Appellant Sean O'Brien appeals the denial of his petition for a writ of habeas corpus.  The district court had jurisdiction pursuant to 28 U.S.C. section 2254.  This Court has jurisdiction over an appeal from the denial of a habeas petition pursuant to 28 U.S.C. section 2253(a).  A certificate of appealability was issued by this Court on April 5, 2022.  A timely Notice of Appeal was filed by O'Brien in the district court on October 6, 2020.

## III.
## APPELLANT'S BAIL STATUS

O'Brien is in the custody of the State of California serving a sentence of life without the possibility of parole.

## IV.
## STANDARD OF REVIEW

This Court reviews *de novo* the district court's decision to deny a 28 U.S.C. section 2254 habeas petition and reviews for clear error the district court's factual findings. *Melendez v. Pliler*, 288 F. 3rd 1120, 1124 (9th Cir. 2002).

In order to establish the ineffective assistance of counsel, a petitioner must show that counsel's performance at trial was deficient and that there is a reasonable probability that but for counsel's deficient performance the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In *O'Brien I*, this Court previously held that "the state court's application of *Strickland* to O'Brien's claim that trial counsel rendered deficient performance in presenting his defense was objectively unreasonable." (ER-38.)

3

## V.
## STATEMENT OF THE CASE

O'Brien was convicted of felony-murder in El Dorado County Superior Court and sentenced to life without parole on October 26, 2006. The judgment was affirmed by the California Court of Appeal and review was denied by the California Supreme Court.

O'Brien filed a habeas petition in the Superior Court in 2009. That petition was denied. A petition for review was denied by the state Supreme Court.

O'Brien filed a habeas petition in the Eastern District of California in 2010. That petition was denied by the district court in 2014. O'Brien appealed.

On October 28, 2015, this Court issued an amended memorandum opinion in which it reversed the district court's denial of O'Brien's petition. *O'Brien v. McEwen*, Ninth Circuit No. 14-15753. (*O'Brien I.*) The Court remanded O'Brien's case to the district court with instructions to hold an evidentiary hearing with respect to O'Brien's claim of ineffective assistance of counsel.

An evidentiary hearing was held in the district court on January 17 and 18, 2017, before Magistrate Judge Carolyn Delaney. The Reporter's Transcript

of that evidentiary hearing is set forth in the Excerpts of Record (3-ER-228-474.) On October 30, 2019, the Magistrate issued Findings and Recommendations which recommended that O'Brien's habeas be denied. (1-ER-6-34.) On October 6, 2020, District Court Judge Morrison England issued an order and judgment denying O'Brien's habeas petition. (1-ER-3-5.) O'Brien filed a timely Notice of Appeal on October 6, 2020. (3-ER-475.) On November 6, 2020, the district court issued an order denying a certificate of appealability. (1-ER-2.) On April 5, 2022, this Court issue a certificate of appealability "with respect to the following issue: whether trial counsel rendered ineffective assistance."

## VI.
## TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE

### A.    Introduction

Generally, as this Court recognized in *O'Brien I*, in reviewing an ineffective assistance of counsel claim the court "must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Cannedy v. Adams*, 706, F.3rd 1148, 1163 (9th Cir. 2013). Here *Cannedy* means the Court must compare the

evidence presented at trial with the evidence presented by O'Brien at the

evidentiary hearing in the district court which could have been presented at trial

had counsel acted appropriately.

The *Cannedy* analysis also bars the habeas court from parsing the

prosecutor's evidence and theory of the case. The Ninth Circuit stated in *Hardy*

*v. Chappell*, 832 F.3rd 1128, 1140 (9th Cir. 2016):

> *Strickland* does not permit the court to reimagine the entire trial. We
> must leave undisturbed the prosecutor's case. We only envision what
> (counsel) should have presented in (Petitioner's) defense and determine
> how that would have altered the trial. In doing so, we may not invent
> arguments the prosecution could have made if it had known its theory of
> the case would be disproved.

In this case, however, there is one important deviation from the *Cannedy*

analysis that neither this Court in *O'Brien I* nor the district court below ever

addressed. On the first day of trial defense counsel was prepared to present a

"solid" alibi defense. That is, up to that point, counsel was not ineffective. That

changed on the second day of trial. At that time the prosecutor disclosed for the

first time that his theory of the case had fundamentally changed. The prosecutor

indicated for the first time that he would argue and present testimony that the

fatal shooting took place at least an hour earlier than previously disclosed. The

question of counsel's effectiveness at trial thus turns on what defense counsel

6

did or didn't do after this fundamental change in the prosecutor's case.

Following the *Cannedy* analysis, O'Brien will set forth below the evidence set forth at trial, how the prosecutor's theory of the case dramatically changed on the second day of trial, and how defense counsel could, but failed, to present available evidence showing that O'Brien nevertheless had a solid alibi even for the newly asserted time of the shooting.

O'Brien will also briefly address the district court's failure to accurately or honestly address the evidence he presented in the district court. O'Brien filed detailed objections to the Magistrate's Findings and Recommendations. (2-ER-52-93.) He pointed out that "the Magistrate misconstrued the evidence and testimony, misunderstood the context in which the testimony fit, and in many instances simply misstated the facts." (2-ER-57.) In many instances the Magistrate simply re-imagined the prosecutor's theory of the case. Neither Respondent nor the District Court made any meaningful attempt to defend the Magistrate's findings. The district court stated only that it had "reviewed the file" and concluded that the Magistrate's Findings were "supported by the record and by the magistrate judge's analysis." (1-ER-4.) As a result, references herein to the "district court " are to the Magistrate's Findings and Recommendations unless otherwise noted.

7

B.     The Evidence Presented at Trial

A more detailed account of the trial evidence can be found in O'Brien's

Opening Brief in *O'Brien I*; Ninth Circuit No. 14-15753, Docket # 5, pp. 9-28.

The 2,143 page Reporter's Transcript of O'Brien's trial was lodged in the

district court in *O'Brien I* and is part of the district court record in this case.

(See ER pp. 147-149 of *O'Brien v. McEwen*, Civ S-10, 2472.) References to the

trial record herein will be cited at "RT".

The prosecutor's theory of the case at trial was that O'Brien shot the

victim, Kyle Smelser, during a residential burglary in rural El Dorado County,

California. The prosecution's key witness, William Wellman, testified at trial

that Tyler Dickson, Sean O'Brien and he participated in the burglary and that

O'Brien fired the fatal shot. O'Brien's asserted an alibi defense; that he was at

home at the time of the shooting.

According to Wellman's trial testimony, on the morning of Wednesday,

February 26, 2003, Wellman met Dickson after Dickson left high school. They

drove to Shawn Sentelio's house in Dickson's pick-up truck.  They stayed at

Santelio's house for about twenty minutes, then went to Sean O'Brien's house.

(RT 374.)

Wellman testified on direct examination that they arrived at O'Brien's

house sometime close to 9 a.m. and stayed thirty to forty minutes. (RT 374, 377.) On cross-examination, Wellman testified they stayed at O'Brien's house "ten minutes at the most." (RT 433.) According to Wellman, the three men departed O'Brien's house in Dickson's pickup truck. O'Brien brought a shotgun with him. (RT 377.) Once in the truck, O'Brien asked Wellman where they could buy shotgun shells. Wellman directed them to the Big Horn Gun Shop. (RT 378-379.)

At the gun shop Wellman, the only one over eighteen, bought one box of shotgun shells. (RT 380-381.) They were in the shop for no more than five minutes. (RT 383.) An employee at the gun shop, Carl Christoffersen, testified that the gun shop always opened at precisely 10 a.m. (RT 1105.) He recalled three young men coming into the shop on the day of the shooting. The three men were the very first customers in the shop that day. Christoffersen could not identify any of the men. (RT 1097-1098.)

After leaving the gun shop, the three men drove to the house they intended to burglarize. (RT 388-389.) They arrived at the house and parked in the driveway. (RT 393, 395.) All three men entered the house. After seeing the victim, Kyle Smelser, inside the house, Wellman and Dickson returned to the truck. Wellman and Dickson were in the truck when Wellman heard a shotgun

being discharged.  Wellman then saw O'Brien come out the front door.  O'Brien

told them, "He's dead."  (RT 399- 400.) All three re-entered the house.

Wellman took some marijuana.  The trio then drove back to O'Brien's house.

(RT 409-410.)

Back at O'Brien's house they smoked some of the marijuana Wellman

had taken from the Smelser's house.  Wellman and Dickson stayed at O'Brien's

house twenty minutes.

Jesse Pine and two other men lived at the burglarized house along with

Smelser.  (RT 898.)   Pine sold marijuana. He had a quarter pound of marijuana

and about $3,000 in cash in his bedroom.  (RT 908, 916, 920.)

Pine returned home at about 3:50 p.m. (RT 912.)  When Pine entered the

house he saw Smelser lying dead on the floor.  Pine said his bedroom door had

been kicked open and his $3,000 was missing. (RT 915-916.)

A pathologist arrived at the scene at 6:18 p.m.  (RT 1062-1063.)  Based

on his observations, he believed that death had occurred six to eight hours

earlier.  However, he thought the time of death was probably closer to noon.

(RT 1065-1066.)   The cause of death was a single gunshot wound to the head.

(RT 1074.)

Knowing that O'Brien planned to present an alibi defense, the prosecutor

10

called numerous witnesses as part of its case-in-chief to establish O'Brien's whereabouts during the day of the shooting. Many of these witnesses were unknown to the prosecution before defense counsel disclosed O'Brien's alibi evidence prior to trial as required by state law.

Frankie Silici had been O'Brien's close friend for four years. On the day of the shooting, Silici called O'Brien at home at 10:12 a.m. Silici thought he woke O'Brien up. (RT 547.)

Chantelle Michaud testified that she called O'Brien at home at about 10:30. (RT 563-564.)

J.D. Petty called O'Brien at home at 11:28 a.m. However, Petty couldn't remember if he actually spoke to O'Brien during this call. Petty had an incoming cell phone call at 11:25 which he said was from O'Brien. He didn't answer this call because he was in school at the time. He thought that the 11:25 incoming call is what prompted him to call O'Brien at 11:28. (RT 690-691.)

Richard Anschultz and O'Brien were friends. (RT 637.) O'Brien called Anschultz from home at 11:31 a.m. Anschultz returned O'Brien's call at 11:34 a.m. He also called O'Brien again at 12:06 and 12:11 p.m. (RT 646.) In their first conversation, O'Brien said that he had $2,500 and wanted to buy some marijuana. Anschultz made at least one attempt to arrange a marijuana

transaction for O'Brien.  (RT 647-650.)

Richard LaCerte and O'Brien were good friends.  (RT 618.)  O'Brien called LaCerte's cell phone at 11:32 a.m. LaCerte called O'Brien back at home at 11:47 a.m. (RT 624, 629, 633.) O'Brien said he had several thousand dollars and was going to buy marijuana with it.  (RT 626, 633.)

O'Brien's older sister, Amanda, planned to arrive at O'Brien's house at 1:30 p.m. because O'Brien was going to install a stereo into her car.  However, O'Brien called her at 11:47 a.m. and told her to come earlier.  (RT 959, 968.) She arrived at approximately 12:20.  When she arrived Mike Carrick, Cliff Sargent, and Treva Fudge were already with O'Brien.  Amanda had never met any of these teenagers.  (RT 960.) At about 1 p.m. a pizza was ordered from Round Table Pizza.  Carrick went to get the pizza.  He came back about forty-five minutes later. (RT 964-965.)  Amanda left at about 2:30 p.m.  (RT 961, 971.)

Cliff Sargent recalled going over to O'Brien's house to install a stereo into Amanda's car.  He got there before noon.  Mike Carrick and Amanda were already there when Sargent arrived. (RT 724-725, 765.)  Sargent was at O'Brien's house for several hours and he recalled ordering a pizza.  (RT 728-729.)

12

In his closing argument, the prosecutor conceded that O'Brien was at home the morning of the shooting. However, the prosecutor argued, "there's a gap in this (O'Brien's) alibi, and it's a gap of 45 minutes," or between 10:45 and 11:30 a.m. (RT 1677.) The prosecution argued that the time of death, as established by Wellman's testimony, was between 10:30 a.m and 11:30 p.m., or during the alleged "gap" in O'Brien's alibi. (RT 1675.)

In its opinion in *O'Brien I*, this Court stated: "The State's theory was that the murder occurred between 10:30 a.m and 11:30 a.m." O'Brien "had a solid alibi, which the State did not contest, establishing that he was at home throughout the period both before and after that one-hour window." (ER 40.)

O'Brien's "solid alibi" before 10:30 and after 11:30 was established by the prosecution's own witnesses. The prosecution proved the following. Frankie Silici called O'Brien at home at 10:12 a.m. (RT 532.) O'Brien called Chantell Michaud at about 10:30 a.m. (RT 563, 577.) O'Brien called J.D. Petty at 11:25 and left a message. Petty returned O'Brien's call at 11:28. (RT 692.) O'Brien called Richard Anschultz at 11:31 a.m. (RT 646.) O'Brien called Richard LaCerte at 11:32 a.m. (RT 626-632.) Sargent, Carrick, and Amanda were with O'Brien at O'Brien's house at least until 2:30.

### C.     The Second Day of Trial and the Hoagland Report

James Clark was trial counsel for O'Brien.  He testified at the evidentiary hearing in the district court in 2017.  He had been retained as counsel in March, 2003, about the time of O'Brien's initial arraignment.  (3-ER-351.)  O'Brien's trial began on February 3, 2004.  (3-ER-352.)  Joseph Alexander was the prosecutor.  (3-ER-353.)

By October or November, 2003, Clark determined that he would "put up an alibi defense."  (3-ER-355.)  After reviewing the discovery disclosed by Alexander  through November 2003, Clark "came to the conclusion that these gentlemen (Wellman and Dickson) appeared at Mr. O'Brien's house at approximately 11:00 in the morning, they fooled around at their house, you know, talking, chatting, whatever they were doing, until approximately 11:30, and then according to their statements, the three of them proceeded to the Treasure Lane residence of the decedent, where the murder/robbery allegedly took place."  (3-ER-356.) In particular, Clark relied upon a pre-trial statement by Dickson to the police that he was "always punctual" and they arrived "at O'Brien's house at 11:00, that's when I was suppose to be there."  (3-ER-356.)

Based on his review of the prosecution's discovery prior to trial, Clark gathered alibi evidence to prove that O'Brien was at home when the prosecution

14

alleged the shooting took place.  O'Brien told Clark that he was at home that

morning, he spoke to his sister Amanda by phone, and he made arrangements to

put a stereo in her car.  Before noon, he was joined by Mike Carrick and Clift

Sargent, "then Amanda shows up with the car for the stereo to be installed."  (3-

ER-357.)  "He (O'Brien) never left the house, is what he told me."  (3-ER-358.)

Clark also obtain the cell phone records of Frankie Silici, Mike Carrick, J.D.

Petty, Richard Lacerte, and Richard Anschutz.  (3-ER-359-360.)

On December 22, 2003, Clark disclosed to Alexander a "witness packet

containing all of the alibi evidence he intended to introduce at trial."  (3-ER-

360, 363.)  The witness packet included the cell phone records.

Trial began on February 3, 2004.  The next day, February 4, 2004, Clark

received from Alexander a "four page report disclosing that Mr. Wellman, one

of the co-defendants, had changed his story."  (3-ER-364.)  This report, the

"Hoagland report," was never introduced at trial but was introduced at the

evidentiary hearing as an exhibit.[1]  "That is the four page report...from a

Detective Hoagland."  (3-ER-365.)  Among other things, the report detailed a

---

[1]     The Hoagland report was admitted as an exhibit in the district court.
3-ER-247 and is part of the record on appeal.  It appears as E, pp. 193-196. The
Hoagland report was also contained in the Excerpts of Record in *O'Brien v.
McEwen*, 14-15753, at pp. 741-744.

meeting between Joseph Alexander, Detective Hoagland, and Wellman on January 2, 2004.  Wellman's lawyer, Mark Ralphs, was also present. (Question: "So that would have been approximately two weeks after you provided the DA with the alibi packet?  (Clark): Correct Sir."  (3-ER 336).)  According to the Hoagland report, as disclosed to Clark on the second day of trial, at this meeting Wellman "had radically changed" the timing of the shooting.  Clark testified, "Well basically, it – it conveniently sideswiped my alibi defense, at least with respect to the telephone calls.  And, basically, the people that were visiting Mr. O'Brien on that day."  (3-ER-365.)  Before Clark received the Hoagland report "the DA's theory was that the murder was after 11:30."  According to Wellman's statement of January 2, as set forth in the Hoagland report, the time of the shooting "now shifts to the morning."  (3-ER-410.)  "But it's now shifted to the morning."  (3-ER-407.)  Wellman has "now changed his story - - dramatically changed his story."  (3-ER-367.)

Clark "felt like the rug had been pulled out from under me."  He "was angry."  (3-ER-366.)  His "mind was, to use a 60's term, blown."  (3-ER-410.)  However, after receiving the Hoagland report, Clark did no further investigation except to take a closer look at Mike Carrick's cell phone records.  (3-ER-369.)

Instead of further investigating O'Brien's alibi defense in light of the

16

prosecutor's new theory of the case and Wellman's "changed...time frame, "

Clark decided "to drill down on Mr. Wellman, and (prove) he's a liar" because

"that time frame didn't get changed until after (Clark) provided the alibi packet

to the DA, correct?  Clark testified, "Absolutely."  (3-ER-412.)  However, Clark

admitted that he "didn't ask Mr. Wellman (at trial) when he changed his story..."

(3-ER-412, 433.)  Nor did Clark ask Hoagland when Wellman changed his

story.  (3-ER-371.)


### D.  The Evidence That Clark Could and Should Have Presented at Trial In Support of O'Brien's Alibi

At the evidentiary hearing in the district court in 2017, O'Brien presented

evidence that Clark could and should have presented at trial that "would have

rendered it virtually impossible for O'Brien to have committed the murder with

which he was charged, given the location of the murder and the S

tate's theory as to when it took place."  (1-ER-39-40.)  Below, O'Brien will

described the evidence presented at the evidentiary hearing that Clark should

have, but did not, present at O'Brien's trial once the prosecutor's theory of the

case changed.

17

### 1.    Robert Gilmore

At trial Wellman described going to the Big Horn Gun Shop to buy shotgun shells the morning of the shooting.  The prosecutor, Alexander, called Carl Christoffersen, an employee of the gun shop, as a witness.  Christoffersen recalled three young men coming into the shop to buy shotgun shells.  He could not identify any of the men.

During his closing argument to the jury Alexander addressed Christoffersen's testimony.  Alexander stated that Christoffersen's testimony corroborated Wellman's testimony that Wellman, O'Brien, and Dickson went to the gun shop and bought the shot gun shells used in the shooting.  (RT 1662.)  But Alexander acknowledged  Christoffersen "couldn't tell us to the minute.  He couldn't say what time they walked through the door, what time they left.  He only could say 'It was kind of around opening, and we open at 10.'  Could be 10:15, could be 10:30, Could be 10:45.  But it's in that range."  (RT 1663.)

According to the Hoagland report of the meeting on January 2, Wellman was asked "if he recalled anything significant while inside the Big Horn Gunshop at that time of the morning."  For the first time, Wellman said "he recalled an employee behind the counter placing guns in the display case."

In his report, Hoagland wrote that on January 3, the day after meeting

18

with Wellman, he went to the Big Horn Gun Shop and spoke to Bob Gilmore,

an employee. Gilmore told Hoagland the shop always opened at 10 a.m.

Gilmore also told Hoagland that "prior to opening the store they return the

handguns to the display cases." Gilmore added that "it is possible at times to

open the doors for business while they are still placing handguns in the cases."

Clark never contacted Gilmore and did not call him as a witness at

O'Brien's trial. (3-ER-398, 402.) Clark testified at the evidentiary hearing,

"Why did I need him?" (3-ER-399.)

Gilmore testified at the evidentiary hearing in the district court. He said

he worked at the gun shop on a full time basis for approximately five years. (3-

ER-275.) The shop opened at 10 a.m. The employees would arrive at the shop

"from 9:30 to 10:00." Once the employees entered the building they unlocked

the handguns from their storage safe and "put them in the display case." (3-ER-

276.) This process took about five minutes. (3-ER-277.) "Now, once the

handguns were put in the display cases and the store was ready for opening" the

shop opened for business. (3-ER-276.) Sometimes Gilmore or another

employee would still be putting the handguns into the display case "at the same

time we opened the door" to the public. (3-ER-279.) When a customer wanted

to see a handgun it would be taken out of the display case. However, this was

done one gun at a time. "If they wanted to see one, they saw it. If they want to see another, put it back and get another out." (3-ER-280.)

Gilmore's testimony would have demolished Alexander's claim that the three men entered the gun shop, "Could be 10:15, could be 10:30. Could be 10:45." (RT 1663.) Wellman's observation of an employee putting guns in a display case could have only taken place at 10 a.m., when the gun shop opened for business.

Gilmore's testimony would have established that O'Brien was not one of the three men who entered the shop. Alexander's evidence undisputedly established that O'Brien was at home at 10:12, when he spoke by telephone with Silici, and at 10:30, when he spoke with Michaud. However, Wellman's observation combined with Gilmore's testimony established that Wellman entered the gun shop at precisely 10 a.m., when the handguns were being placed into the display case. O'Brien could not have been at the gun shop at 10 a.m. with Wellman and Dickson and at home and on the telephone with Silici and Michard between 10 and 10:30.

In her Findings, the Magistrate stated that "Gilmore's testimony is consistent with Wellman seeing 'an employee behind the counter placing guns in the display case and a middle-aged customer talking to another employee

20

about an upcoming hunting trip" at some point later than 10 a.m. According to Gilmore, the guns already would have been in the display case when the shop opened to the public, but a gun could have been removed from, and returned to, the case any time if requested by a customer." (1-ER-14.) The Magistrate misstated the facts.

Wellman said that he 'recalled an employee behind the counter placing guns in the display case." Wellman expressly said gun_s_, not a gun. The gun_s_ were taken from a safe where they were stored overnight and placed in the display case at or before 10 a.m. Gilmore further testified that after the shop opened, guns were taken out of the display case *one at a time*. Gillmore testified as follows:

> Q: So when you had customers, they would ask for a gun, gun would be taken out, you'd show it to them?
>
> Gilmore: Yes, sir.
>
> Q: And then it would be put back?
>
> Gilmore: Yes, sir.
>
> Q: Would customers sometimes ask to see several guns?
>
> Gilmore: Yes, sir.

Q:          So several guns would be taken out of the display case?

Gilmore:    No.

Q:          No?

Gilmore:    Not that I can recall.  Not general policy.  If they wanted to
            see one, they saw it.  If they wanted to see another, put it
            back and get another...

Q:          Okay.  And I think you were asked, during the day the guns
            were taken out of the display case to show to customers,
            correct?

Gilmore:    Yes.  Generally one at a time.

Q:          That was normal procedure - -

Gilmore:    Yes, sir.

(3-ER-280-281.)


Wellman did not see an employee take a single gun out of the display
case, show it to a customer, then replace that single gun back into the display
case.  Even if a customer wanted to see multiple guns, the employee would only
remove one gun at a time from the display case before returning that gun to the
display case to get another.   Wellman's statement that "he recalled an employee

22

behind the counter placing guns in the display case" could only have been made at the time the shop opened, or at 10 a.m.  The Magistrate's conclusion that Gilmore's testimony did not establish what time Wellman arrived at the gun shop is simply wrong.

### 2.    Edward Winslow

Ed Winslow was employed at an automotive shop owned by O'Brien's mother, Deborah O'Brien.  (3-ER-306.)  Winslow was the service manager at the shop.  (3-ER-285, 306.)

Winslow spoke to Clark prior to trial.  (3-ER-288.)  Winslow "talked to him on the telephone and he talked to him in person."  (3-ER-289, 309.)  Prior to trial Winslow told Clark "off the top of (his) head" that O'Brien had called the shop the morning of the shooting.  (3-ER-289, 310.)  He told Clark that if he looked at the shop paperwork for that morning it "would help narrow it (the call) down."  (3-ER-291, 300.)  Winslow testified that at the time he spoke to Clark he thought he "could be more specific if (he) went over the paperwork from that day..."  (3-ER-338.)  Winslow testified: "Well, I told Clark that it would be hard to - - right off the top of my head to pinpoint the time, but if I could sit down with him later that I could.  And then I would probably have

23

said, yeah, we can use some of the daily records to help me with that." (3-ER-336.)

Clark told Winslow that "he wouldn't be needed" as a witness. (3-ER-290, 306, 330.) Clark never requested any documents from Winslow and did not ask Winslow to look at any. (3-ER-305, 330.)

Clark testified that he did indeed talk to Winslow prior to trial. Clark admitted that Winslow told him that he "received a phone call from Sean (O'Brien) on the morning of the murder." (3-ER-415.) Clark asked Winslow to "[g]ive me a specified time." But, according to Clark, "he couldn't give me a definite time." Clark then told Winslow, "I can't use you." (3-ER-406.)

Clark admitted that his decision not to call Winslow as a witness at trial was made prior to the disclosure of the Hoagland report on the second day of trial. At that time Winslow's testimony that O'Brien called the morning of the shooting was "irrelevant." Clark said, "Who cares where he (O'Brien) is" in the morning. (3-ER-407.) Clark said he "had all these great phone records, and I had all these people coming over who saw Mr. O'Brien in the flesh at his home, so I didn't see the need for Mr. Winslow, number one." (3-ER-406.)

However, once he received the Hoagland report, "and the time now shifts to the morning," it never occurred to Clark to contact Winslow again or call him

24

as a witness. (3-ER-410-411.) Winslow was available and would have testified had Clark asked him to do so. (3-ER-331.)

Had Clark called him as a witness Winslow would have testified that O'Brien called the shop every day to speak to his mother and that he recognized his voice when he called. (3-ER-292, 301, 307.) O'Brien usually called the shop around 10 a.m. on the land line from his home. (3-ER-292-293.)

On morning of the shooting, Joan Sirmack came to the shop to have work done on her car. She authorized the shop to begin the work at 10:16 a.m. (3-ER-295.) The work on Ms. Sirmack's car was completed and she paid with her debit card at 10:49 a.m. (3-ER-298.) Winslow identified an invoice indicating that Ms. Sirmack checked her car into the shop at 10:16. He also identified a "Debit Sale" receipt, electronically time and date stamped at "10:49 a.m.-02/26/03" as "a debit sale payment by Ms. Sirmack for the work that was done that day." (3-ER-298; Exhibit E, p. 612.) These were the documents Winslow told Clark he needed to review "to be more precise about when Mr. O'Brien called." (3-ER-300.) If Clark had asked him to look at these documents and if Clark had called Winslow as a witness, Winslow would have testified that O'Brien called the shop that day "right when I was helping her (Sirmack). Either cashing her out, or in that area..." (3-ER-296.) Winslow would have

testified that O'Brien called "sometime around 10:47, as reflected in E 617..."
(3-ER-305.) "It would have been when I was helping Joan Sirmack, either
printing her tech worksheet or cashing her out with the credit card sales slip."
(3-ER-315.) In short, had Clark called Winslow as a witness at trial, Winslow
would have testified that he spoke to O'Brien on the telephone "sometime
around 10:47" when Winslow was "helping Joan Sirmack."

In her Findings, the Magistrate never addressed these facts. The
Magistrate never addressed the fact that after the Hoagland report was
disclosed, Clark never contacted Winslow to see if he could pinpoint when
O'Brien called. Had Clark done so, Winslow could and would have testified
that O'Brien called the shop at 10:49.

### 3. O'Brien Did Not Have a Cell Phone and Made No Calls In Wellman's Presence

#### a. O'Brien Made No Telephone Calls in Wellman's Presence

Hoagland's report of January 2 stated: "I (Hoagland) then asked Wellman
if O'Brien made any telephone calls that morning, from his residence and prior
to leaving for Smelser's residence. Wellman said he didn't notice O'Brien
make any calls." Hoagland's report further stated: "I (Hoagland) asked

(Wellman) if O'Brien had a cellular telephone with him and if he made any call (sic) on the way to Smelser's residence. Wellman said no."

At trial Clark never asked Wellman if O'Brien had or used a cell phone or whether O'Brien made any telephone calls from his residence either before or after the shooting. Nor did Clark ask Hoagland if Wellman had made these statements.

In the district court, Wellman testified quite clearly that O'Brien did not have a cell phone and did not make any telephone calls while he was allegedly at O'Brien's house.

| Question: | Mr. O'Brien did not have a cell phone? |
|---|---|
| Wellman: | No. |
| Question: | That's correct? |
| Wellman: | That's correct. |
| Question: | Did you also tell Detective Hoagland and Deputy District Attorney Alexander that Mr. O'Brien did not make any telephone calls while you were at the O'Brien house? |
| Wellman: | He did not. |

(3-ER-449.)

27

Wellman clarified his answer.

> Question: Well did Mr. O'Brien make any telephone calls in you presence that morning?
>
> Wellman: No in my presence, no.
>
> Question: He did not.
>
> Wellman: No.
>
> Question: Now if you'd been asked at trial as to whether Mr. O'Brien had a cell phone or not, what would your answer have been?
>
> Wellman: I would have said no.
>
> Question: He did not have a cell phone?
>
> Wellman: He did not.
>
> Question: If you had been asked at trial whether Mr. O'Brien had made any phone calls in your presence at this house, what would your answer have been?
>
> Wellman: I would have said no....He did not.

(3-ER-450-451.)

At trial, Wellman testified that he arrived at O'Brien's house sometime

close to 9 a.m. and stayed thirty to forty minutes (direct examination) or "ten minutes at most" (cross examination). (RT 374, 377, 433.) He then drove to the Big Horn gun shop.

It was undisputed at trial that Frankie Silici called O'Brien at home at 10:12 a.m. Silici spoke to O'Brien at that time. Silici was a prosecution witness. It was also undisputed that O'Brien called Chantelle Michaud on the telephone at about 10:30 a.m. Michaud was a prosecution witness. (RT 563-564, 577.)

In his closing argument, the prosecutor told the jury, "It puts them at Sean O'Brien's house anywhere from 9:30 to 10:30, right around the phone conversation with Chantell Michaud." (RT 1663.) Later in his argument, Alexander stated, "But what did she (Michaud) tell you. She said, 'I talked to Sean at about 10:30 in the morning." (RT 1667.)

Testimony from Wellman (or Hoagland) that O'Brien never used a telephone while he was supposedly in O'Brien's house would have established that Wellman and Dickson were not inside O'Brien's house between 10:11 and 10:30 a.m. when O'Brien was on the telephone with Silici and Michaud. Such evidence would have proved that Wellman and Dickson could only have arrived at O'Brien's house *after* the 10:30 telephone conversation between O'Brien and

29

Michaud.

This evidence would have proven that Wellman's trial testimony, that he arrived at O'Brien's house "sometime close to 9 a.m.," was false. This evidence would also have negated the prosecutor's claim that Wellman and Dickson were "at O'Brien's house anywhere from 9:30 to 10:30." This evidence would have established that Wellman and Dickson arrived at O'Brien's house, if at all, after O'Brien's 10:30 call with Michaud. Further, if O'Brien left with Wellman and Dickson to go to the gun shop, as Wellman testified, that had to have happened, if at all, after the 10:30 call with Michaud. And, if Wellman and Dickson remained at O'Brien's house for "thirty to forty minutes" or "ten minutes at most," as Wellman testified at trial, they could not have left O'Brien's house before 10:45.

Finally, Wellman testified that after the shooing they returned to O'Brien's house and spent twenty minutes there. If Wellman was testifying truthfully, that meant that they had to have been inside O' Brien's house twenty minutes before O'Brien resumed his telephone calls; to Petty at 11:25, to Anschult at 11:31, and to LaCerte at 11:32. If Wellman was testifying truthfully, they had to be back at O'Brien's house no later than 11:10. There is no possible scenario by which Wellman could have left O'Brien's house at

30

10:45 and returned by 11:10. Evidence that O'Brien made no telephone calls in Wellman's presence proved that Wellman was lying about the shooting and O'Brien's role in it.

In her Findings, the Magistrate called this evidence "cumulative." (1-ER-20.) However, the Magistrate never indicated what evidence was introduced at trial for which this evidence was "cumulative." This evidence was certainly not cumulative. This evidence completely destroyed the prosecutor's new theory of the case.

### b. O'Brien did not have or use a cellular telephone

To repeat, the following facts, introduced by the prosecutor, were undisputed at trial: (1) Frankie Silici called O'Brien at home at 10:11 a.m.; (2) O'Brien called Chantell Michaud at about 10:30 a.m.; (3) O'Brien called Petty at 11:25 and Petty returned the call at 11:28; (4) O'Brien called Richard LaCerte at 11:31; (5) O'Brien called Richard Anschultz at 11:32. If, as Wellman told Hoagland on January 2, 2004, O'Brien did not have or use a cell phone that day, all of those telephone calls were made from or received by O'Brien at his residence. In short, without a cell phone, O'Brien had to have been at home at 10:11, 10:30, 11:25, 11:31 and 11:32.

31

Wellman testified that he stayed "thirty to forty" or "ten minutes at most" at O'Brien's house before driving to the scene of the shooting. He also testified that he remained at O'Brien's house for 20 minutes after the shooting. (RT 410.) Assuming the shortest time span, Wellman's testimony at trial was that he spent a total of at least thirty minutes at O'Brien's house during which O'Brien made no telephone calls.

The prosecutor alleged that there was a "gap" in O'Brien's alibi from 10:30 to 11:30. However, if, as Wellman testified, he was in O'Brien's house for thirty minutes while O'Brien made no telephone calls and O'Brien did not have a cell phone, that gap shrinks to just twenty-five minutes. There is no possible scenario by which the shooting could have taken place with a twenty-five minute gap.

Hoagland's report clearly set forth Wellman's statements that O'Brien had no cell phone and did not make any telephone calls in Wellman's presence. It would have been a simple matter to have Wellman testify to those facts at trial. Yet, Clark never asked those questions.

As with the evidence that O'Brien made telephone calls in Wellman's presence, the Magistrate found evidence that O'Brien did not have or use a cell phone was cumulative. The Magistrate concluded: "it is unclear how it would

32

have helped petitioner's case" and that "any testimony to this effect by Wellman would have been cumulative." (1-ER-20.) In support of her claim that this evidence would have been cumulative, the Magistrate cited the trial testimony of Silici that "petitioner did not own a cell phone at the time of the shooting."

The issue is not whether O'Brien "owned" a cell phone, but whether he used a cell phone the morning of the shooting. Sicili did not see O'Brien until 3:15 the afternoon of the shooting. (RT 527.) Sicili did not know and could not testify whether O'Brien had or used a cell phone earlier that day.

Had Clark asked Wellman these simple questions, Wellman's answers, would have destroyed any alleged gap in O'Brien's alibi. Further, it would have proved Wellman was indeed lying. Wellman's story would only have made sense if the shooting had actually taken place after 11:30 at Wellman originally claimed.

### 4. Travel Routes And The Alleged "Gap" in O'Brien's Alibi

At trial, Detective Hoagland testified that the Alexander asked him to "drive some routes" from O'Brien's house, to the Big Horn Gun Shop, to the scene of the shooting, and back to O'Brien's house. (RT 1125, 1127.) Hoagland testified that he drove four such routes. These routes took 36

33

minutes, 39 minutes, 40 minutes, and 47 minutes. (RT 1129-1132.) On cross-examination, Clark did not ask any questions about these routes.

Clark later recalled Hoagland as a defense witness. (RT 1385.) Hoagland testified that he was "never able to determine what that exact route was" that Wellman and Dickson drove the morning of the shooting. (RT 1386.) Clark asked no further questions about the routes.

During his closing argument, Alexander expressly argued that "there's this gap in this (O'Brien's) alibi, and it is a gap of 45 minutes." Alexander then immediately addressed "the driving times." Alexander argued to the jury:

> We know from Detective Hoagland's testimony and this chart detailing the different routes that Detective Hoagland took. Because the people he spoke to weren't able to describe the route to the Treasure Lane house, Detective Hoagland drove four different routes...
>
> And so, there's a gap in this alibi, and it is a gap of 45 minutes. And if you remember - - I have them here. The driving times that Detective Hoagland was able to obtain driving the speed limit and obeying all the laws were 40 minutes, 39 minutes, 36 minutes, and

47 minutes....All these times fit within the gap.

(RT 1676-1677.)

Hoagland's report of the January 2, 2004 meeting with Wellman stated: Wellman was still uncertain of the exact route they drove to and from the victim's residence. Wellman said he does recall traveling on Green Valley Road when they left Treasure Lane. He also recalled getting on Forni Road, near In and Out Burger, and driving passed the Walmart also on Forni Road.

At the evidentiary hearing in the district court Wellman testified that he "was foggy on the direction we took." (3-ER-453.) However, Wellman said the route described in Hoagland's report was a "proper recollection." It was "[a]s accurate as I could give...at that time." If he had been "asked at trial about your travel route" Wellman said, "I would give the same answer." (3-ER-453-454.)

Hoagland's report also stated that when he drove the route described by Wellman on January 2, 2004, "my total travel time was approximately forty-seven minutes, (47)."

In the district court the parties stipulated that on January 3, 2004, the day after the meeting with Wellman, Detective Hoagland drove the forty-seven minute route described in his report based on the information from Wellman. (3-ER-231.)

Alexander's argument, that the "people (Hoagland) spoke to weren't able to describe the route taken" was false. On January 2, 2004, Wellman told Hoagland the route he took as accurately as he could. Hoagland drove <u>that</u> and only that route the next day. That drive took forty-seven minutes.

Clark never introduced evidence through either Wellman or Hoagland that Wellman had described a particular route to Hoagland and the route Wellman described took forty-seven minutes to drive. If Clark had presented that evidence, it would have demonstrated that the so-called gap in O'Brien's alibi had to be at least forty-seven minutes. If Clark had presented that evidence, Alexander could not have argued that driving times of thirty-six, thirty-nine, and forty minutes were even relevant.

In her Findings, the Magistrate stated that evidence the route driven by Wellman required 47 minutes was largely irrelevant. According to the Magistrate, even if O'Brien spoke to Michaud at 10:30 and Carrick at 11:14, there was still a 44 minute gap in O'Brien's alibi and a drive-time of 47 minutes, or 3 minutes longer than the so-called gap, was rather insignificant. (1-ER-22-23.) However, the Magistrate misstated the facts.

Wellman expressly testified that he was at O'Brien's house for "thirty to forty minutes" or "ten minutes at most" before going to the gun shop and an

36

additional twenty minutes after the shooting. During that time, he was not present when O'Brien called Silici at 10:11, Michaud at 10:30, Carrick at 11:14, and Petty at 11:25. Even assuming the shortest total time claimed to be at O'Brien's house, 30 minutes, there is no gap in O'Brien's alibi that could accommodate that 30 minutes <u>and</u> 47 minutes of driving. There is no 77 minute gap in O'Brien's alibi. The Magistrate simply failed to account for all of the relevant facts.

Further the Magistrate disingenuously cast doubt on O'Brien's call with Michaud at 10:30. (1-ER-22.) The Magistrate stated that "there was no evidence that Michaud spoke to petitioner at 'about 10:30 a.m.' other than her and petitioner's statements." However, the Magistrate failed to recognize that *the prosecutor* introduced and relied upon the evidence of the 10:30 phone call with Michaud.

In his closing argument Alexander argued that the call between O'Brien and Michaud happened *"right around 10:30 in the morning or just before 10:30...That's 10:30 in the morning."* (RT 1662.) Alexander then argued that Wellman arrived at the gun shop, "Could be 10:15. Could be 10:30. Could be 10:45." Alexander acknowledged that Wellman was not sure about the time, "so you don't have to rely on Mr. Wellman. You can look at Mr.

37

Christoffersen. *You can look at Chantell Michaud.*"  (RT 1663; emphasis added.)  In other words, Alexander argued that Wellman arrived at the gun shop "could be 10:45," because he had to account for the 10:30 phone call with Michaud.

Alexander then addressed "this alibi" asserted by O'Brien.  (RT 1674.) Alexander argued that "there's a gap in this alibi, *and it is a gap of 45 minutes*." (RT 1677; emphasis added.)  Alexander conceded that O'Brien was home at 11:30 because "we know he's on the phone at 11:30 because we have the other end of that conversation."  (Id.)  Thus, according to Alexander's argument at trial, the gap started at 10:45, or after O'Brien's call with Michaud.

The Magistrate simply ignored Wellman's testimony that he spent at least 30 minutes inside O'Brien's house during which time O'Brien was not on the telephone.  When <u>all</u> of Wellman's testimony is considered, not just selected parts, the so-called gap in O'Brien's alibi virtually disappears.

Hoagland's testimony about driving times of 36, 39 and 40 minutes was both irrelevant and misleading.  The route *actually described by Wellman* prior to trial required 47 minutes to drive.  If, as Wellman claimed, O'Brien did not make any calls in his presence and did not have or use a cell phone, there was no 47 minutes gap in O'Brien's alibi.  If Clark had presented this readily

38

available evidence it would have substantially destroyed Alexander's alleged "gap" in O'Brien's alibi.

### 5. The 11:14 Telephone Call to Mike Carrick

In his opening statement, Clark told the jury that he would present evidence that at 11:14 "O'Brien called a gentleman by the name of Mike Carrick. That will be documented, I believe by phone records and/or testimony." (RT 343.)

O'Brien testified at trial that he "called Mike Carrick at some time that morning and he called me back about 11:14, 11:15, somewhere in there." When O'Brien was asked why he had called Carrick, he testified that Carrick "was going to come over that afternoon...Just to hang out, smoke some pot." After calling Carrick, O'Brien "called my friend Richard Anshultz" at a "[l]ittle before 11:30." (RT 1281.)

In his closing argument to the jury, the prosecutor said, "But there's no evidence other than Mr. O'Brien's word that he called Mr. Carrick that day at 11:14...and in this case there isn't any evidence of that 11:14 call..." (RT 1675-1676.) The prosecutor further argued that "there's a gap in this alibi, and it is a gap of 45 minutes," or from 10:45 to 11:30 a.m. "All these times fit within the

gap." (RT 1677.)

At the evidentiary hearing in the district court, Clark admitted that he told the jury in his opening statement that he was "going to prove" that there was a phone call between O'Brien and Michael Carrick at 11:14. (3-ER-330.)

Clark obtained Carrick's cell phone records prior to trial. They were included in the "witness packet containing all of the alibi evidence he intended to introduce at trial" which was disclosed to the prosecutor on December 22, 2003. (3-ER-360.)

Clark also obtained the cell phone records for J.D. Petty prior to trial. (3-ER-376.) They were also disclosed to the prosecutor on December 22, 2003.

All of the telephone records obtain by Clark were introduced at trial subject to a stipulation by the parties that they were "generally admissible." For instance, the telephone records for Richard LaCerte were introduced by the prosecution by way of a stipulation with the defense. Pursuant to that stipulation LaCerte's phone records "was marked for identification and admitted generally." (RT 617.) The same process took place for the telephone records of Dickson, Sicili, Anshultz, and Petty. (RT 195, 197, 531, 641-642, 689.) The records were found by the court to be "admitted generally" as "business records." (RT 195, 198.)

Carrick's phone records demonstrated that he received only two incoming calls during the relevant time period the morning of the shooting. One incoming call was received at 11:14, the other incoming call was received at 11:47. (3-ER-374, 376.)

In the district court Clark said he did not "know who placed that (11:14) call. It could be anybody." (3-ER-376, 424.)

However, Clark had also obtained Petty's telephone records prior to trial. Petty's telephone records demonstrated that he made the call to Carrick at 11:47.[2] (3-ER-378.) Clark admitted "that leaves the 11:14 call in Mr. Carrick's records..." (3-ER-379.)

Clark also admitted that he knew that Carrick told Detective Hoagland in a recorded pretrial statement that O'Brien called him around 11:14. (3-ER-380-381,391.) Finally, Clark conceded that evidence of the 11:14 call by O'Brien to Carrick "would have been exceptionally helpful" to O'Brien's alibi. (3-ER-379.) Clark further stated that after Wellman changed the timing of the shooting to the morning, "that phone call to Carrick was pretty significant..." (3-ER-422.)

---

[2] The trial court, when addressing O'Brien's motion for new trial, expressly found the telephone call "at 11:47 didn't involve Mr. O'Brien...Mr. Petty made the phone call." (RT 1909.)

41

However, Clark never introduced any evidence that O'Brien called Carrick at 11:14 other than O'Brien's uncorroborated testimony. Clark said he did not introduce any evidence of the 11:14 phone call from O'Brien to Carrick because Carrick asserted his Fifth Amendment privilege when called to testify as a prosecution witness. (3-ER-384.)

When called as a witness Carrick asserted that "he's taking the Fifth for all purposes." Clark immediately informed the trial court, "Then I have no questions." (RT 894-895.) No one, particularly Clark, asked whether Carrick would assert his privilege if questioned solely about the 11:14 call from O'Brien.

At the evidentiary hearing, Clark testified that "if a person comes into court and says, with regard to the subject matter of this testimony, I choose to invoke my Fifth Amendment privilege, the analysis and the inquiry is over." (3-ER-387.) Clark said he "just gave up on it at that point." (3-ER-387-388.) "I felt that once somebody invokes the Fifth, that's it." (3-ER-388.) Clark said he "did not link Carrick's invocation of the Fifth Amendment to the alleged 11:14 phone call." (3-ER-389.)

At the time of O'Brien's trial it was well established in California law that a witness "may not make a blanket assertion of the privilege against self-

incrimination...In other words, a trial court must make a particularized inquiry,
deciding, in connection with each specific area that the questioning party wishes
to explore, whether or not the privilege is well founded." *People v. Trujeque*,
61 Cal.4th 227, 267-268 (2015). The state supreme court in *Trujeque* further
stated, "Although the witness may have a valid claim to privilege with respect
to some questions, the scope of that privilege may not extend to all relevant
questions. The witness may be totally excused only if the court finds that he
could legitimately refuse to answer essentially all relevant questions. This has
long been the rule in California in both civil and criminal proceedings." *Id.;*
internal citations deleted.

   Clark was wrong as a matter of law. Clark's belief that "as soon as Mr.
Carrick said, I'm taking the Fifth, I was done" was erroneous. A competent
attorney would have had the court inquire into whether questions about
O'Brien's 11:14 phone call with Carrick was a "specific area that the
questioning party wishes to explore" for which Carrick may not have had a
"valid claim to privilege." Such an inquiry would have plainly demonstrated
that nothing about the 11:14 phone call would have incriminated Carrick. There
would have been no basis for Carrick to invoke his right against self-
incrimination concerning that "specific area." All such questions would have

established that O'Brien called Carrick at 11:14, while Carrick was still in school.  Nothing further was relevant.

As a direct result of Clark's failure to understand clearly established state law related to the privilege against self-incrimination he failed to introduce Carrick's testimony that O'Brien called him at 11:14, as reflected in Carrick's telephone records. Proof that O'Brien called Carrick at 11:14 would have closed any alleged gap in O'Brien's alibi.

Even if Carrick had validly invoked his right again self-incrimination at O'Brien's trial, Clark could have introduced the evidence of O'Brien's 11:14 call to Carrick by other means.  Clark was aware that Detective Hogland conducted a recorded interviewed of Carrick prior to trial.  (3-ER-391.)  At that time Carrick told Hoagland that he called O'Brien on the telephone prior to leaving school.  Carrick told Hoagland that O'Brien called him "probably around 11:15, 11:30, somewhere right around there."  (3-ER-380.)  As demonstrated above, his telephone records indicated that Carrick received only two incoming calls that morning; one at 11:14 and one at 11:47.  The 11:47 call was from Petty.

Clark admitted that Carrick's telephone records were consistent with Carrick's pretrial statement to Hoagland and "would have corroborated Mr.

O'Brien making a phone call at 11:14, or thereabouts..." (3-ER-381-382.)

Clark further admitted that "it certainly could have been argued to the jury that

way..." (3-ER-382.)

At trial Clark called Hoagland as a defense witness. (RT 1385.)

Nevertheless, Clark never asked Hoagland about Carrick's pretrial statements

concerning the 11:14 phone call. Nor did Clark "show Detective Hoagland the

phone bills and ask him to illuminate the issue in front of the jury." (3-ER-391.)

Finally, Clark could have introduced Carrick's telephone records during

O'Brien's testimony. As discussed above, O'Brien testified that he called

Carrick "at sometime that morning and he called me back about 11:14, 11:15,

somewhere in there." (RT 1281). Clark could have shown Carrick's telephone

records to O'Brien during O'Brien's testimony and asked if those records

reflected the fact that he called Carrick at 11:14. Clark admitted that Carrick's

telephone records we available "to admit" and the 11:14 call to Carrick was

"part of (the) alibi defense", yet he never sought to have Carrick's telephone

records introduced as evidence at trial. (3-ER-428.)

As discussed above, Alexander expressly argued to the jury, "But there's

no evidence other than Mr. O'Brien's word that he called Mr. Carrick that day

at 11:14...(RT 1675.) Alexander further argued that "in this case there isn't any

evidence of that 11:14 call..." (RT 1676.)

Alexander's argument was false. There was evidence of the 11:14 call. That evidence was not presented by Clark. Evidence of the 11:14 call from O'Brien to Carrick would have demolished Alexander's argument that there was a "gap" in O'Brien's alibi from 10:45 to 11:30. There was, in fact, no such gap.

In her Findings, the Magistrate wrongly concluded that Carrick could properly assert a blanket refusal to answer any and all questions because he would have incriminated himself. (1-ER-27.) The Magistrate failed to understand state law.

The Magistrate also failed to understand the facts. The Magistrate speculated that such questions "not only could have linked him to knowledge of a robbery and murder, but petitioner testified that he phoned Carrick so that the two of them could (illegally) smoke marijuana that afternoon." (3-ER-27.)

There was no evidence linking Carrick to "a robbery or murder" or that he had any knowledge of such crimes. At trial Alexander, made it absolutely clear that Carrick had no role in the robbery or shooting. For several pages of his closing argument Alexander set out in detail the facts concerning Carrick. Alexander began but stating, "But Michael Carrick - - now, here is a guy with an alibi and a very, very good one, one established by the detectives, one

46

discussed during the case. What's his alibi?" (RT 1678.) Alexander went on to described Carrick's whereabouts the day of the shooting from 8:14 a.m. to 1:30 p.m. Alexander noted that Carrick left O'Brien's house at 1:30 to pick up a pizza and that time was "outside our window. It's outside by an hour the latest time of day that Mr. Smelser was killed." (RT 1680.) Alexander concluded: "So Mr. Carrick...has an alibi. We know where he was. And he wasn't at Treasure Lane." (Id.) "So Mr. Carrick is accounted for." (RT 1681.)

The Magistrate failed to cite a single fact implicating Carrick in the robbery or shooting. The Magistrate failed to acknowledge the prosecutor's argument that Carrick was not implicated in the robbery or shooting.

The Magistrate also asserted that Carrick's testimony concerning the 11:14 call would incriminate him in smoking marijuana. Not so. O'Brien testified that the call was to discuss smoking marijuana later that afternoon. A discussion about smoking marijuana at a later time is not a crime.

The Magistrate utterly failed to explain why the cross-examination of Carrick could not have been restricted to the 11:14 phone call and excluded events that occurred hours later. The Magistrate failed to explain how testimony about the 11:14 call was in any way incriminating.

Finally, the Magistrate concluded that even if Clark had established the

11:14 call such evidence would not preclude the "alleged 47-minute round trip to the Treasure Lane house" where the shooting took place. (1-ER-28.) Again, however, the Magistrate misstated the facts. In its opinion in *O'Brien I* this Court specifically stated that the 11:14 call to Carrick, along with the 10:49 call to Winslow, left "only a 25-minute gap in his alibi...which could well have caused jurors to doubt whether O'Brien participate in the crime." (1-ER-40.) The Magistrate failed to indicate why this Court's statement is incorrect or otherwise not binding on the district court.

Further, the Magistrate failed to recognize the prosecutor's theory of the case. Alexander expressly argued to the jury that the so-called gap in O'Brien's alibi was "of 45 minutes." Alexander put that "gap" at 10:45 to 11:30 because he conceded that O'Brien was at home at 11:25 when he called Petty and 11:31 when he called LaCerte. Evidence that O'Brien was a home and on the phone with Carrick at 11:14 reduced the so-called gap in O'Brien's alibi to 29 minutes. Alexander could not and did not argue that the entire trip, to the gun shop, to the scene of the shooting, then back to O'Brien's house, could take place within 29 minutes. Simply put, the Magistrate once again ignored the dictates of *Hardy v. Chappell* and invented "arguments the prosecution could have made if it had known its theory of the case would be disproved."

48

### 6. Carrick's ATM Thefts And the Money Used to Buy Marijuana

Jesse Pine testified that he had about $3,000 in cash in his bedroom and that after the shooting the money was gone. (RT 916.) Cliff Sargent testified as a prosecution witness that O'Brien had a big "wad of money" on the afternoon of the shooting. (RT 725-726.) The prosecutor argued to the jury that the money O'Brien showed Sargent the afternoon of the shooting was stolen from the burglarized residence where Smelser was shot.

O'Brien testified that after installing the stereo in his sister's car that day, he and Carrick purchased marijuana from Carrick's cousin, Nate McKelvie. O'Brien contributed $800 to the purchase while Carrick contributed $1200. (RT 1286-1287.) O'Brien testified that he obtained his money from his mother's bank account by improperly using her ATM card. (RT 1307.) O'Brien's mother testified that O'Brien admitted to her that he improperly used her ATM card. (RT 1425-1427.)

At trial, Clark called Deputy Sheriff Paul Hadjes to testify that O'Brien and Carrick both made improper withdrawals using Deborah O'Brien's ATM card. (RT 1447-1457.) As part of Hadjes's testimony Clark established that Carrick withdrew $500 from Deborah O'Brien's ATM at 8:14 a.m. on the day of the shooting. (RT 1455.)

Clark only introduced evidence that Carrick made the single $500 ATM withdraw on February 26th, the day of the shooting. Clark failed to present evidence to explain to the jury how Carrick could have $1200 for the marijuana purchase the day of the shooting. He failed to introduce evidence that Carrick "made unauthorized ATM withdrawals from Deborah O'Brien's bank account on February 24 and 25th of 2003. Each of those unauthorized withdrawals by Carrick were for $500. Together with the $500 Carrick obtained the day of the shooting, Carrick obtained $1500 within the two days prior to the shooting. That explains the money he contributed to the marijuana purchase.

At the evidentiary hearing in the district court the parties stipulated that "that Mike Carrick made unauthorized ATM withdrawals from Deborah O'Brien's bank account on February 24th and 25th of 2003. Each of these withdrawals was for $500." (3-ER-231.)

This evidence would has corroborated O'Brien's testimony that Carrick contributed $1,200 to the marijuana purchase on the afternoon of the 26th. This evidence would have corroborated O'Brien's testimony that he only had $800 and that the bulk of money used to purchase the marijuana came from Carrick who had stolen it from Deborah O'Brien's ATM.

50

### 7.     Wellman Admitted He Committed Perjury At O'Brien's Trial

After Clark received Hoagland's report on the second day of trial, he understood that Wellman "had changed his story." (3-ER-364.) Clark explained, "It was – what it was it was timing. He (Wellman) got there early. They went down, they came back, and it all happened before a time where I really had sufficient cell phone coverage." (3-ER-365.) However, Clark did virtually no further investigation. (3-ER-369.) Instead, he decided that he would "show that Wellman is a liar, so who cares about anything else." (3-ER-410.) The defense was "still alibi...[w]ith the overlay that the - - original time frame was correct, Wellman is a liar." (3-ER-411-412.) That is, Wellman was "a liar when he changed the time frame." (3-ER-412, 420.)

At trial, Wellman admitted that when he was arrested on March 7, 2003, ten days after the shooting, he told the police in a tape-recorded interview that the shooting took place at 1:30 or 2 in the afternoon. (RT 463.) Wellman also admitted that he did not change his story concerning the timing of the shooting until his meeting with Alexander, Hoagland, and Ralphs on January 2, 2004. (RT 461, 464.)

At the evidentiary hearing in the district court Wellman similarly admitted that when interviewed by the police on March 7, 2003, ten days after

the shooing, he said he arrived at O'Brien's house "about 11:30, almost 12:00." (3-ER-438-439.)  Thus, the shooting would have occurred about 12:15 to 12:45. (3-ER-439.)  Wellman also testified at the evidentiary hearing that he "never gave it (the timing of the shooting) a second thought" until the meeting on January 2, 2004.  (3-ER-442-443, 445.)

On direct examination at trial, Wellman explained why his trial testimony was different from his pretrial statement. During direct examination, the prosecutor, Joseph Alexander, asked Wellman why he changed the timing of the shooting from what he told the police on March 7, 2003.  Wellman testified,

> Um, those times that I mentioned when I first was interviewed, I was - - I was - - you know, there was a lot going through my mind, so I wasn't able to think clearly.  But since I've been - - since that day I've had a lot of time to think about  - - think things through and allow my mind to calm down, and I've remembered, you know, more accurately what happened, the times and such.
>
> (RT 423.)

Also during Wellman's direct examination at trial, Alexander asked the

following questions and Wellman gave the following answers:

| | |
|---|---|
| Alexander: | I'm going to ask you a few questions about your understanding of that plea bargain. To begin with, have you changed your testimony in any way, or form because of that plea bargain? |
| Wellman: | No, I haven't. |
| Alexander: | Has Detective Hoagland asked you to change your testimony in anyway? |
| Wellman: | No. |
| Alexander: | Has Detective Moschini asked you to change your testimony in anyway? |
| Wellman: | No, he hasn't. |
| Alexander: | Has anyone from my office asked you to change your testimony in any way in exchange for that plea bargain? |
| Wellman: | No. |
| Alexander: | Have I asked you? |
| Wellman: | No. |

(RT 420.)

Detective Hoagland also testified at trial about the meeting with Wellman on January 2, 2004. (RT 1387.) Hoagland claimed that during the course of this meeting Wellman revealed "new facts" about the shooting. Hoagland

claimed that during the meeting Wellman "revealed that he felt the time frame was different than the first two (pretrial) interviews . . ."  (RT 1387-1388.) Hoagland was expressly asked, "At any time during that (January 2, 2004) meeting, did anyone suggest to Mr. Wellman that he should change anything about what he had told us?"  Hoagland testified, "No, sir."  (RT 1394.)

Clark's plan was to show that Wellman's testimony - that he changed the timing of the shooting nearly a year later as the result of having "a lot of time think about it" - was a lie.  However, Clark never asked the relevant questions which would have established that Wellman was lying.  Had Clark done so, he would have clearly established that both Wellman and Hoagland lied and that Alexander suborned their perjury.

Clark testified at the evidentiary hearing in the district court that he knew "that that time frame didn't get changed until after (Clark) provided the alibi packet to the DA."  (Question): "But you didn't ask Mr. Wellman when he changed his story, did you."  (Clark) I don't believe I did."  (3-ER-412.)

Had Clark asked both Wellman and Hoagland at trial if Wellman only changed the timing of the shooting *after* Clark disclosed O'Brien's alibi evidence, Clark would have established before the jury that Wellman only changed his story because O'Brien  could prove, to use the this Court's words,

"a solid alibi, which the state did not contest." Put another way, Clark could have established that Wellman lied when he testified that he changed his story because he had more time to think about it. Clark could have shown the jury that Wellman changed his story because otherwise his testimony actually supported O'Brien's alibi.

Wellman admitted these facts at the evidentiary hearing in the district court. Wellman testified that his attorney, Mark Ralphs attended the January 2, 2004 meeting with Alexander and Hoagland. Wellman was told that he would be asked about "your time frame" at trial. In the district court Wellman was asked if "they told you there is a problem with what you initially told them? They told you that right?" Wellman answered: "In so many words." (3-ER-446.) Wellman further testified that his attorney, Mark Ralphs, "brought it up to me that it would be an issue." Wellman was asked, "But your lawyer informs you there may be an issue with your original statement? Wellman replied, "Correct." (3-ER-448.)

Welllman testified in the district court:

(Wellman): My attorney brought it up to me. Brought it to my attention, yes.

55

(Question):  And what did he say?

(Wellman):  He said that there may be a question about the time frames.

(Question):  That you had relayed back in March 2003?

(Wellman):  Right.

(3-ER-456-457.)

The meeting on January 2, 2004, was the first time Wellman heard that there was a concerns about his original statements.  (3-ER-457.)

Welllman then testified in the district court:

(Question):  Well here is the question: You've testified today that you were not informed that there was a problem with your story until January or shortly before, correct?

(Wellman):  Correct.

(Question):  All right.  Did you testified to that at trial, that you were informed in January that there was a problem with your story?

(Wellman):  No.

(Question):  And you made no change in your story all through 2003,

true?

(Wellman):   True.

(Question):  It wasn't until your lawyer said there is a problem with it that

                    you changed your story, correct?

(Wellman):   Once it was brought to my attention....

(Question)   Did you change your story because you were sitting in jail or

                    because your lawyer told you there was a problem with it?

(Wellman):   Because my lawyer told me there was a problem.

(3-ER-460-461)


Later in his testimony, Wellman said that his lawyer, Ralphs, told him,

"Something about the times didn't line up."  (3-ER-462.)

In the district court counsel for Respondent asked Wellman what Ralphs

had told him.  Wellman testified, "It was given that my time frame wasn't lining

up with - - something comes to memory about the coroner's estimated time of

death."  (3-ER-467.)

Clark was right; Wellman was a liar. In the district court Wellman

admitted that he lied at O'Brien's trial. Wellman only changed the timing of the

shooting after O'Brien disclosed his alibi evidence and after the prosecutor

knew that Wellman's original account of the timing of the shooting could not be true because O'Brien's alibi evidence proved he was home when Wellman claimed the shooting took place. Wellman changed the timing of the shooting because his attorney told him "the times didn't line up." Wellman lied at trial when he testified he changed the time of the shooting because he had more time to think about it. Hoagland lied when he testified that no one suggested to Wellman "that he should changed anything."

This was the pivotal point at O'Brien's trial. If Wellman testified that the shooting took place in the afternoon, which is what he told the police, O'Brien had an undisputed alibi. Wellman changed the timing of the shooting, to a time where there was an alleged "gap" in O'Brien's alibi, because his attorney, Ralphs, in the presence of Alexander and Hoagland, told him "there was a problem" and "the times didn't line up." Wellman changed the timing of the shooting to a time when the "times" did line up. Wellman then lied to the jury about why he changed his story.

The jury never heard these facts. The jury never heard that Wellman changed his story only after O'Brien disclosed his alibi evidence. The jury never heard that Wellman only changed his story after he was told "the times didn't line up." What the jury heard, as quoted above, was Wellman's

58

testimony that Alexander and Hoagland, did not ask him to change his testimony. (RT 420.) He did it on his own. The jury never heard, because the questions were never asked, that Ralphs told Wellman there was a problem with story and that is why he changed it.

It bears repeating that both Alexander and Hoagland knew that Wellman committed perjury. They were both present when Ralphs told Wellman "the times didn't line up." They knew why Wellman changed his story and that his testimony on that issue was false. Yet, they did nothing.

Had the jury heard that Wellman only changed the time of the shooting after O'Brien disclosed his alibi evidence and after Ralphs told him there was a problem with his story, they would have concluded that Wellman was a liar. The jury did not hear this evidence because Clark failed to ask the relevant questions.

The Magistrate's Findings addressed none of these facts. The Magistrate stated that "Wellman testified that no one asked him to change his story, that he did not feel he would lose his plea deal if he failed to change his story, and that he had been 'trying to testify honestly.'" (1-ER-24.) He further testified that no one told him that he needed to change his story to a specific different time. (3-ER-215.)" (1-ER 24.)

59

While the Magistrate admitted that Wellman "change[d] his story," she failed to recognize or address the fact that Wellman committed perjury at O'Brien's trial. As the this Court recognized in *O'Brien I*, the key issue at trial was the time of the shooting. The documents Clark disclosed to the prosecutor in December 2003, a month before trial, and the evidence Clark presented at trial established that O'Brien "had a solid alibi" except for the gap between 10:30 and 11:30 a.m. At the meeting on January 2, 2004, ten days after Clark disclosed his alibi evidence, Wellman was expressly told that "there was a problem" and that the "problem was that "my time frame wasn't lining up." In plain and simple English, Wellman was told that his pretrial "time frame" of the shooting did not line up with what the prosecutor and Wellman's attorney now knew to be true; that O'Brien had "a solid alibi" after 11:30 a.m. After Wellman was told that there was a "problem" with his time of the shooting, he changed his story. He then lied at trial concerning *why* he changed his story. He testified at trial that he changed his story because he "had a lot of time to think about it." At the evidentiary hearing, Wellman admitted that his testimony was false. He testified that he changed his story because he was told that "the times didn't line up." (3-ER-462.)

Tellingly, the Magistrate never addressed Wellman's testimony at pages

3-ER-460 to 461 of the evidentiary hearing. Wellman testified at the evidentiary hearing as follows:

> Q: It wasn't until your lawyer said there is a problem with it that you changed your story, correct?
>
> Wellman: Once it was brought to my attention.
>
> Q: Right. Then you changed your story, right?
>
> Wellman: It could be looked at like that, yes....
>
> Q: Did you change your story because you were sitting in jail or because your lawyer told you there is a problem with it?
>
> Wellman: Because my lawyer told me there was a problem.

(3-ER-460-461.)

The Magistrate stated that "Clark testified that he thought he could highlight Wellman's changed story for petitioner's benefit 'because a jury would conclude, that guy is lying, and the DA's case is nonsense[.]" (1-ER 24.) The Magistrate then concluded: "The evidentiary hearing did not adduce any new evidence that Wellman had lied or been advised to lie in exchange for a plea deal, such that Clark could have done anything meaningfully different with

61

this witness at trial.   (1-ER-25.)

The Magistrate was wrong.  As the above makes abundantly clear, Wellman testified at trial that he changed his story because he "had a lot of time to think about it - - think things through and allow my mind to calm down..."  At the evidentiary hearing, Wellman expressly testified that he changed his story "*Because my lawyer told me there was a problem*" and "the times didn't line up."  (3-ER-461-462.)  Wellman lied to the jury.

Clark was right; "Wellman is a liar".  (3-ER-412.)  Clark was right in believing that Wellman's new story "conveniently sideswiped my alibi defense."   Clark was right in believing that he needed to prove that "he's a liar when he changed the time frame."   Nevertheless, at trial Clark never asked Wellman the relevant questions. The Magistrate's conclusion, that Clark could not "have done anything different with this witness" (Wellman), again is simply wrong.

### E.     Competent Counsel Would Have Established That It Was "Virtually Impossible For O'Brien To Have Committed The Murder...Given The Location of the Murder and the State's Theory As To When It Took Place"

In *O'Brien I* this Court stated that the "State's theory was that the murder

occurred between 10:30 a.m. and 11:30 a.m. O'Brien had a solid alibi, which

the State did not contest, establishing that he was at home throughout the period

both before and after that one-hour window." (1-ER-40.) This Court also noted

that "there was no physical evidence directly tying O'Brien to the murder..."

(Id.)

At O'Brien's trial Alexander expressly argued that there existed a gap in

O'Brien's alibi and the gap was 45 minutes, or between 10:45 and 11:30 a.m.

Alexander's theory of the case was that O'Brien, Wellman and Dickson left

O'Brien's house after O'Brien's telephone call with Michaud at 10:30 and

arrived at the gun shop no later then 10:45. They then drove to Smelser's house

where the shooting took place. Alexander acknowledged that they must have

returned to O'Brien's house by 11:25 when O'Brien called Petty on the

telephone.

In support of his theory of the case, Alexander introduced evidence that:

(1) Frankie Silici called O'Brien at home at 10:11 a.m.; (2) O'Brien called

Chantell Michaud at about 10:30 a.m.; (3) O'Brien called Petty at 11:25 and

Petty returned the call at 11:28; (4) O'Brien called Richard LaCerte at 11:31; (5)

O'Brien called Richard Anschultz at 11:32.

If Clark had acted effectively he could have established that no gap

existed in O'Brien's alibi and that Wellman lied about O'Brien's alleged role in the shooting.

Clark could have introduced the testimony of Edward Winslow that O'Brien called his mother's automotive shop at 10:49. Clark could introduced the testimony of Mike Carrick that O'Brien called him at 11:14. In conjunction with this testimony, Clark could have had Wellman testify that O'Brien never made a telephone call or used a cell phone in his presence. This readily available testimony would have eliminated any gap in O'Brien's alibi.

Clark could have also had Detective Hoagland testify that the route to and from the scene of the shooting which Wellman described to him at the January 2 meeting required 47 minutes. Wellman testified at trial that he spent anywhere from ten to thirty or forty minutes at O'Brien's house before the shooting and 20 minutes at O'Brien's house after the shooting. As noted above, Clark could have had Wellman testify that O'Brien never made a telephone call or used a cell phone in his presence. When the 47 minute drive time is combined with the 30 minutes or more spent at O'Brien's house before and after the shooting, Wellman claimed he spent at least 77 minutes with O'Brien. Alexander's own evidence proved that O'Brien spoke to Michaud at 10:30 and Petty at 11:25. Wellman's story is necessarily false and Clark could have easily demonstrated

64

that to the jury.

Alexander's theory of the case also included the claim that the $2,000 O'Brien and Carrick used to buy marijuana the afternoon of the shooting came from the theft of $3,000 from Jesse Pine's bedroom. However, Clark could have proven that Carrick stole $1,500 from Deborah O'Brien's ATM within two days prior to the shooting and that was the money used to purchase the marijuana.

Finally, Clark admitted that his strategy was to prove Wellman was a liar, yet he made no attempt to do so. Wellman's testimony on direct examination by Alexander was that he changed the time of the shooting from the afternoon to the morning because he "had a lot of time to think about – things through and allow my mind to calm down, and I've remembered, you know, more accurately what happened, the times and such." That was perjury. At the evidentiary hearing in the district court Wellman admitted that he changed the time of the shooting, "Because my lawyer told me there was a problem." The problem, Wellman was told, "that my time frame wasn't lining up..."

Clark could have proved that Wellman was a liar and that his testimony that O'Brien was involved in the shooting was factually impossible. O'Brien need only show that, "but for (Clark's) allegedly deficient performance, there is

a reasonable probability that at least one juror would have credited the additional evidence and harbored a reasonable doubt about (O'Brien's) guilt." (*O'Brien I*, 1-ER-39, citing *Cannedy* 706 F.3rd at 1166.)  The evidence Clark could and should have presented at trial not only would have changed the mind of at least one juror, it would have conclusively established he was factually innocent of the murder of Smelser.

## VII.

The judgment of the district court must be vacated and this case must be remanded to the state court with instructions to grant O'Brien's petition.

DATED: June 10, 2022                                Respectfully submitted,


                                       /s/ DAVID NICKERSON
_____DAVID NICKERSON
                                       Attorney for Appellant/Petitioner
                                       SEAN ALAN O'BRIEN

## CERTIFICATE OF COMPLIANCE

Pursuant to Ninth Circuit Rule 32(e)(4), I certify that Appellant's Opening Brief is in proportionately spaced type (Times New Roman, 14 point) and is less than 14,000 words.   It contains 13,775 words.

_____ /s/ DAVID NICKERSON
DAVID NICKERSON
Attorney for Appellant
SEAN ALAN O'BRIEN

## NOTICE OF RELATED CASE

This case is related to *O'Brien v. McEwen*, Ninth Circuit No. 14-15753.

# PROOF OF SERVICE

**Appellant/Petitioner O'Brien's Opening Brief, Ninth Circuit # 20-16970**

All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the forgoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECT system on June 11, 2022.

I certify that all participants in the case are registered CM/ECF uses and that service will be accomplished by the appellate CM/ECF system.

/s/ DAVID NICKERSON