20-16970

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**SEAN ALAN O'BRIEN,**

Petitioner-Appellant,

v.

**LELAND MCEWEN, Warden, Calipatria State Prison,**

Respondent-Appellee.

---

On Appeal from the United States District Court
for the Eastern District of California

No. 2:10-cv-02472-MCE-CKD
Morrison C. England, Jr., Senior Judge

### APPELLEE'S ANSWERING BRIEF

Rob Bonta
Attorney General of California
Michael P. Farrell
Senior Assistant Attorney General
David Andrew Eldridge
Deputy Attorney General
Max Feinstat
Deputy Attorney General
State Bar No. 274712
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7746
 Fax: (916) 324-5322
 Email: Max.Feinstat@doj.ca.gov
*Attorneys for Respondent-Appellee*

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................1

Statement of Jurisdiction...............................................3

Statement of Issues .........................................................4

Statement of the Case......................................................4

Statement of Facts...........................................................4

Summary of Argument ....................................................9

Standard of Review........................................................10

      A.    Appellate Standards ...................................10

      B.    Ineffective Assistance of Counsel Standards................10

Argument........................................................................14

   I.    Petitioner Failed to Prove, Factually, That Evidence Was Available to Trial Counsel to Prove the Crimes Occurred When Petitioner Was at Home ..............................................14

      A.    If Wellman Saw Multiple Guns Moved in the Gun Store, That Could Have Been at About 10:25 AM .......17

      B.    Unavailable at Trial Was Testimony That Petitioner Called the Autobody Shop at 10:49 AM ......20

      C.    There Was No Evidence That the Trip Could Not Have Taken Less than Forty-Seven Minutes, Nor That Such a Timespan Would Disprove Petitioner's Participation...............................................27

      D.    Petitioner Did Not Prove He Called Carrick at 11:14 AM ...................................................................33

          1.    The New-Facts-Based Claim is Procedurally Barred ............................................................40

          2.    The Claims Are Meritless ..................................42

i

# TABLE OF CONTENTS
## (continued)

**Page**

E.  Demonstrating That Carrick Obtained Money from Petitioner's Mother's ATM Account Would Not Have Changed the Outcome at Trial ............................43

Conclusion................................................................................48

Statement of related cases ........................................................49

# TABLE OF AUTHORITIES

**Page**

CASES

*Allen v. Woodford*
   395 F.3d 979 (9th Cir. 2005).................................................................10

*American Title Ins. Co. v. Lacelaw Corp.*
   861 F.2d 224 (9th Cir. 1988).................................................................41

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*
   568 U.S. 455 (2013).................................................................41

*Anderson v. City of Bessemer City, N.C.*
   470 U.S. 564 (1985).................................................................10

*Bobby v. Van Hook*
   558 U.S. 4 (2009).................................................................12, 14

*Burger v. Kemp*
   483 U.S. 776 (1987).................................................................12

*Chandler v. United States*
   218 F.3d 1305 (11th Cir. 2000).................................................................11

*Cunningham v. Wong*
   704 F.3d 1143 (9th Cir. 2013).................................................................47

*Davis v. Woodford*
   384 F.3d 628 (9th Cir. 2004).................................................................12, 13

*Dows v. Wood*
   211 F.3d 480 (2000).................................................................13

*Early v. Packer*
   538 U.S. 3 (2002).................................................................26

*Eslaminia v. White*
   136 F.3d 1234 (9th Cir. 1998).................................................................10

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Marquez*
  1 Cal. 4th 584 (1992) ............................................................13

*Intel Corp. v. Terabyte Intern., Inc.*
  6 F.3d 614 (9th Cir. 1993).....................................................26

*Inwood Labs., Inc. v. Ives Labs., Inc.*
  456 U.S. 844 (1982)..............................................................10

*Kimmelman v. Morrison*
  477 U.S. 365 (1986)..............................................................11

*LaGrand v. Stewart*
  133 F.3d 1253 (9th Cir. 1998)..............................................12

*Larita-Martinez v. I.N.S.*
  220 F.3d 1092 (9th Cir. 2000)..............................................26

*Lord v. Wood*
  184 F.3d 1083 (9th Cir. 1999)........................................16, 27

*Mann v. Ryan*
  828 F.3d 1143 (9th Cir. 2016)..............................................27

*Maryland v. Kulbicki*
  136 S. Ct. 2 (2015)................................................................11

*Matylinsky v. Budge*
  577 F.3d 1083 (9th Cir. 2009)..............................................13

*McMann v. Richardson*
  397 U.S. 759 (1970)..............................................................11

*Medtronic, Inc. v. Daig Corp.*
  789 F.2d 903 (Fed. Cir. 1986)..............................................26

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Mendez-Gutierrez v. Gonzales*
    444 F.3d 1168 (9th Cir. 2006)................................................................42

*Miles v. Ryan*
    713 F.3d 477 (9th Cir. 2013)..................................................................13

*Miller-El v. Cockrell*
    537 U.S. 322 (2003)...............................................................................26

*Mitchell v. United States*
    526 U.S. 314 (1999).......................................................................35, 43

*Morris v. California*
    966 F.2d 448 (9th Cir. 1991)..................................................................13

*Nix v. Whiteside*
    475 U.S. 157 (1986)........................................................................12, 27

*People v. O'Brien*
    C054011, 2008 WL 2955548 (Cal. App. 3d Dist. Aug. 4,
    2008) .........................................................................................................6

*People v. Silveria*
    10 Cal. 5th 195 (2020) ..........................................................................34

*People v. Vu*
    143 Cal. App. 4th 1009 (2006)...............................................................35

*Premo v. Moore*
    562 U.S. 115 (2011)...............................................................................36

*Raich v. Gonzales*
    500 F.3d 850 (9th Cir. 2007)..................................................................35

*Roe v. Flores-Ortega*
    528 U.S. 470 (2000)..................................................................11, 12, 14

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Crooked Arm*
  853 F.3d 1065 (9th Cir. 2017)..................................................41

*United States v. Yazzie*
  743 F.3d 1278 (9th Cir. 2014)..................................................26

**STATUTES**

California Evidence Code
  § 1200...............................................................................43
  § 1200(a)...........................................................................36
  § 1200(b) ..........................................................................36
  § 1350...............................................................................36

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Fifth Amendment ..............................................................17

**COURT RULES**

9th Circuit Rule 28-2.8 .............................................................34

Federal Rules of Appellate 4(a)(1)(A)........................................3

**INTRODUCTION**

On February 26, 2003, confronting invaders in his home, Kyle Smelser was murdered by gunshot. Convicted of the murder, Petitioner claimed any rational attorney would have presented certain evidence to establish that he was at his own home at the time of the murder, because he was making calls all day and could only have used the phone at his home.

The fact of Petitioner's direct participation in the murder was overwhelming. William Wellman testified he and Tyler Dickson were with Petitioner at Smelser's home that morning as accomplices in Petitioner's planned home burglary. A drug dealer resided there and the plan was to steal. No one was expected to be home, but Petitioner brought a shotgun and Wellman bought ammunition at Petitioner's request. They entered the home. Smelser exited his room and confronted them. Dickson and Wellman fled; outside, they heard a gunshot. Petitioner exited the home and said, "He's dead." They all re-entered the home and stole cash, drugs, and Smelser's rifle.

Petitioner's friend Chantell Michaud testified that morning Petitioner told her he was going to go commit the thefts, and that he told her later that day that he had done so. And indeed Petitioner newly had money that day. A friend testified he gave a requested shotgun to Petitioner that morning, and

1

that Petitioner later returned the shotgun to him with a box of ammunition with one shell missing. And a store employee testified that three males purchased a box of ammunition that day.

Petitioner's claim on this appeal concerns the timeline. Overwhelming evidence of the "what"—i.e., that Petitioner in fact killed Smelser that day— meant the prosecution needed not prove a precise "when." Rather, such proof of the fact of his conduct that day was more than enough reason for jurors to convict, unless other evidence affirmatively *disproved* any possible "when." That is, unless such other evidence persuaded jurors the burglary-murder was during a period when he was at home. And there was another problem—jurors had reason to be skeptical of a telephone-records based alibi for Petitioner, for he had falsified just such an alibi previously.

At least one possible timeline was this: The cohorts left Petitioner's home right after 10:10 AM. They were at the gun store ten minutes later. Petitioner killed Smelser at the scene at about 10:35 AM. The cohorts left the scene by 10:45 AM. Giving priority to distance from the crime scene (and not compliance with speed limit laws), they reached Petitioner's home by about 10:58 AM.

Despite trial evidence proffered by the defense to make any timeline unavailable as to the "when," jurors found Petitioner's guilt established

beyond a reasonable doubt.  And, despite a federal habeas evidentiary hearing, he failed to show that additional evidence would have made the above timeline unavailable as to the "when."  Jurors had Michaud's testimony that Petitioner called her that day, and her pre-trial statement that it was "like 10:30 in the morning."  But "like 10:30" was on its face an approximation, consistent with an actual time of perhaps twenty minutes earlier.  Indeed, rationally, there was no reason why, at the time, Michaud would have made a note of exactly when the time was, such that later she even *could* recall it accurately.  So nothing foreclosed a 10:10 AM commencement of the criminal venture.  And the district court needed not (and did not) find any new evidence was persuasive enough to make it reasonably likely that about 10:58 AM was foreclosed as the end of that venture.  Thus, evidence of guilt necessarily is still at least compelling (or even overwhelming).  That bars the writ.

## STATEMENT OF JURISDICTION

Judgment was entered against Petitioner on October 6, 2020.  (1-ER-38.)  Petitioner timely appealed the same day.  Fed. R. App. P. 4(a)(1)(A). (1-ER-47–8.)  This Court granted a Certificate of Appealability on the issue of "whether trial counsel rendered ineffective assistance."  (Dkt. 5.)

## STATEMENT OF ISSUES

In a case where other evidence compellingly established Petitioner in fact was part of a home burglary leading to murder, was evidence available that the crimes occurred when Petitioner was actually at home, but trial counsel deficiently and prejudicially did not present it?

## STATEMENT OF THE CASE

After an evidentiary hearing on remand from this Court, the Magistrate Judge recommended that all of Petitioner's claims be denied on the merits, and found Petitioner's new claims to be also procedurally barred. (1-ER-6–34.) The District Court adopted the findings and recommendation in full. (1-ER-4–5.) Petitioner appealed that same day. (1-ER-47–48.)

## STATEMENT OF FACTS

Wellman entered into a plea bargain, a condition of which was that he testify truthfully in the trial of Petitioner and Dickson. (1-ER-9.) Per Wellman, he and Dickson drove to Petitioner's house on the morning of February 26, 2003, where they agreed to Petitioner's plan to steal money, marijuana, and dirt bikes from a house at which Petitioner thought no one would be home. They then drove to the Big Horn Gun Shop. At the direction of Petitioner, who had a shotgun with him, Wellman purchased a box of shotgun shells. (1-ER-9.)

4

Carl Christoffersen worked at the Big Horn Gun Shop. That day he sold a box of shotgun shells to three young men, two of them younger, and the third older man being tall and slender. (1-SER-120–23.) The store opened at 10:00 AM. The three were the first customers and the sale was some time "shortly" after opening. (1-SER-124, 132–33.)

The three drove to Smelser's home and entered. Petitioner carried the shotgun. Unexpectedly, Smelser exited a bedroom holding a rifle. Wellman and Dickson fled to the truck; a gunshot sounded. Petitioner exited and said, "he's dead." The three re-entered; Smelser's body was on the floor. From the home, Petitioner took cash and Wellman took marijuana. The three left with Smelser's rifle, which Petitioner discarded into a pond. (1-ER-9.)

Dickson testified in his defense and generally corroborated Wellman's account. Dickson could not recall what time they arrived at Petitioner's house that morning. (1-ER-9.)

Petitioner's friend J.D. Petty testified he loaned Petitioner his shotgun that morning, and Petitioner telephoned him at 11:25 AM to inform him he could retrieve it.[1] That afternoon, from Petitioner, Petty received both the

---

[1] Records showed an incoming 11:25 AM call to Petty's cell phone, but no number; Petty testified it was Petitioner who called. The records showed an 11:28 AM outgoing call to Petitioner's home phone. (1-SER-88–91, 225.)

shotgun and a box of shotgun shells with one shell missing—and the box was from the Big Horn Gun Shop. In confirmation that the box had been full earlier that day, Petitioner said he had used the shotgun to fire the missing shell into a hillside. The shell that killed Smelser was consistent with those shells. (1-ER-9.)

Michaud testified that Petitioner telephoned her that morning. (1-SER-25.)[2] At trial, she did not recall the time, but she believed her recall would have been better when speaking to police on March 4, 2003, six days after the murder. (1-SER-9–10; *see* 1-SER-222.) But that 2003 approximation was that it was "like 10:30" that morning.[3] (1-SER-224.) Petitioner said he was going to get some money, marijuana, and dirt bikes from a house that had "roommates" who were expected to be absent. That evening, Michaud asked if everything had gone okay. Petitioner said it had not and he did not want to discuss it on the phone. Later that evening, Michaud saw a news report about the murder. The next day, she asked Petitioner whether the

---

[2] From the appellate opinion's factual summary, the Magistrate Judge mistakenly states Michaud telephoned Petitioner. *See People v. O'Brien*, C054011, 2008 WL 2955548, at *5 (Cal. App. 3d Dist. Aug. 4, 2008).

[3] Asked specifically as to time, Michaud said, "I remember the conversation. I don't remember the time of the phone call." (1-SER-10.)

murder was the thing that had gone wrong. In a pretrial interview, Michaud told the police that Petitioner answered affirmatively. (1-ER-10.)

Clifford Sargent testified that at about noon on the day of the murder, he went to Petitioner's home. Petitioner took him aside, showed him a "'wad of cash,'" and said he had killed a person for it. Petitioner said the cash totaled about $2,400, that no one was supposed to be the home, and he shot the person because he pointed a gun at Petitioner. (1-ER-24–25.).

Richard Anschutz testified that in an 11:34 AM telephone conversation, Petitioner said he had $2,500 and wanted to buy marijuana. Asked about the source of that money, Petitioner said he did not want to say over the phone. (1-ER-10.)

Richard Lacerte testified that in a telephone conversation at 11:47 AM or later, Petitioner said he had "'a couple [of] grand'" and wanted to buy marijuana. (1-ER-10.)

Frankie Silici testified that he took Petitioner to the victim's house twice prior to the murder, Silici each time buying marijuana from resident Jesse Pine. Pine confirmed he had sold marijuana to Silici at the house, in Petitioner's presence. (1-ER-10.)

In his defense, Petitioner testified he woke up when Silici called him around 10:15 AM. He showered, then telephoned Michaud around 10:30

AM. (1-SER-141–42.) He called Silici back around 10:45 AM and left a message. (1-SER-142.) He called Carrick "at some time" in the morning and Carrick called him back at 11:14 AM. (1-SER-144.) He called Anshutz and Lacerte around 11:30 AM. (1-SER-144.)

In rebuttal, there was evidence that Petitioner previously tried to create an alibi using telephone records, after committing a crime. He previously stole his uncle's gun. Afterward, with his mother's assistance, he consulted telephone records to try creating an alibi for the time his theft. The alibi was false, i.e., ultimately he admitted the theft. (1-SER-211–21.)

Still, there was the above documentation that Petitioner was home up to about 10:12 AM, then a gap in documentation until the above-noted call from the home phone to Lacerte, which call was documented as being made at 11:32 AM.[4] (1-SER-55.) For example, after a 10:11 AM call to Petitioner, Silici's phone bill showed that it was not until 11:45 AM that Petitioner called Silici back (1-SER-198–99), fairly showing that Petitioner lied on a significant point, i.e., when he asserted he called back at 10:45 AM. And Petitioner—already not credible—was the only source of concrete

---

[4] Petitioner did not testify that he talked to Petty the morning of the murder. He denied asking Petty for a shotgun. (1-SER-162.)

assertions that he telephoned Michaud and Carrick between 10:12 AM and 11:31 AM. (1-ER-20.)

Before trial, Petitioner's attorney James Clark believed that the prosecution would argue the shooting was between 11:30 a.m. and 1:00 p.m. Clark developed alibi evidence for that timespan. At trial, Clark learned that Wellman had changed his story, to say the shooting was before 11:30 a.m. In an April 2008 declaration, Clark explained he did not think a continuance would be granted if requested, and he did not think one necessary. He had some evidence that Petitioner was home before 11:30 a.m. And Wellman's change of story was accompanied by him testifying under a plea agreement. Clark thought it best to argue "Wellman changed his story, not because it was the truth, but only to save his plea agreement. If the jury believed Wellman was lying, they would acquit O'Brien." (1-ER-10.)

## SUMMARY OF ARGUMENT

Trial evidence was compelling and indeed overwhelming as proof that in fact Petitioner physically committed the burglary and personally murdered Smelser. Petitioner fails to show it was clear error for the district court to find his new evidence was not credible enough to make that trial proof less than compelling or overwhelming. Because new evidence did not credibly

show he was making calls from home between 10:11 AM and 11:25 AM, the writ is barred on the ineffective counsel claim.

## STANDARD OF REVIEW

### A. Appellate Standards

This Court reviews the denial of the writ de novo. *Eslaminia v. White*, 136 F.3d 1234, 1236 (9th Cir. 1998). District Court findings of fact are reviewed for clear error. *Allen v. Woodford*, 395 F.3d 979, 992 (9th Cir. 2005). Given "two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 568 (1985); *and see Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 857-58 (1982) (reviewing court "cannot substitute its interpretation" simply to " 'give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent.' " (quoting *United States v. Real Estate Boards*, 339 U.S. 485, 495 (1950))).

### B. Ineffective Assistance of Counsel Standards

Surmounting *Strickland*'s high bar is never an easy task." . . . An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. … Even under de novo review, the standard for judging counsel's

10

> representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . .

*Richter*, 562 U.S. at 105 (citations omitted). Counsel's acts are tested objectively, not subjectively. *Roe v. Flores-Ortega,* 528 U.S. 470, 479 (2000); *Strickland v Washington*, 466 U.S. 668, 687-88 (1984); *see also Chandler v. United States*, 218 F.3d 1305, 1315-16 & nn.16-17 (11th Cir. 2000).

The "highly demanding" task is to show conduct for which the only objective explanation is "gross" incompetence. *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). Counsel need not "be a flawless strategist or tactician," or fear "reasonable miscalculation or lack of foresight," or "prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110. Mistake is not deficiency, for errorless performance is not the norm. *Id.*; *McMann v. Richardson*, 397 U.S. 759, 769, 770 (1970) (not deficient that counsel may have "mistakenly assessed" some point, or "misjudged" the law). Rather, it must be proved "his errors are 'so serious' that he no longer functions as 'counsel.' " *Maryland v. Kulbicki*, 136 S. Ct. 2, 3 (2015).

Lower courts may not promulgate further specifics. *Strickland*, 466 U.S. at 688 ("More specific guidelines are not appropriate."); *id.* at 689

11

("detailed guidelines" may "distract counsel from the overriding mission of vigorous advocacy of the defendant's cause"); *see Richter*, 562 U.S. at 106-07; *Roe*, 528 U.S. at 479; *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) (Constitution demands no "particular response," but only that counsel's conduct be "reasonably effective").[5]  Despite a petitioner's natural bent to focus on what counsel may not have done, the primary deferential focus is on what counsel did "overall."  *Richter*, 562 U.S. at 111 ("it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy"); *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (irrelevant that counsel could have done "more thorough investigation"); *see Davis v. Woodford*, 384 F.3d 628, 642 (9th Cir. 2004) (ask "not what defense counsel could have pursued, but rather whether the choices made by

---

[5] Nor can the privately-run American Bar Association's ("ABA") advice become constitutional commands to counsel.  First, counsel is not compelled to adhere to such advice.  *Bobby v. Van Hook*, 558 U.S. 4, 8-9 (2009).  Second, for a court to consider such advice—even in a limited way as less-than-"categorical" information about what some trial counsel might reasonably do—two conditions must be met.  It must first appear, affirmatively, that such advice actually does "reflect '[p]revailing norms of practice,' . . . and 'standard practice,' . . . ."  *Id.* at 8 n.1 (citations omitted).  In short, the ABA's advice must be a reflection of standards that already exist—the advice cannot establish standards in the first instance.  A second condition is that such advisements must not be "so detailed that they would 'interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions,' . . . ."  *Id.*

defense counsel were reasonable"); *LaGrand v. Stewart*, 133 F.3d 1253, 1275 (9th Cir. 1998) ("The Constitution 'requires a good deal less than maximum performance' ").

For example, while "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," nonetheless a "heavy measure of deference" applies to any "particular decision not to investigate." *Strickland*, 466 U.S. at 691; *Matylinsky v. Budge*, 577 F.3d 1083, 1082 (9th Cir. 2009) (there is no general duty of "exhaustive witness investigation"). Focus on one strategy to the exclusion of others is within the province of counsel to elect, given "reason to believe" the others would be fruitless. *Strickland*, 466 U.S. at 691; *Miles v. Ryan*, 713 F.3d 477, 491 (9th Cir. 2013).

And, even if the errors were so serious that at a given point the attorney could not be deemed to function as counsel, the petitioner still must prove a reasonable probability he otherwise would have fared better—a showing, in all but "the rarest case," effectively that a more favorable result was more probable than not. *Richter*, 562 U.S. at 111-12. A petitioner must show the actual evidence claimed to be reasonably likely to have made a difference in a hypothetical trial. *Davis*, 384 F.3d at 650; *Dows v. Wood*, 211 F.3d 480, 486-87 (2000); *In re Marquez*, 1 Cal. 4th 584, 604 (1992); *see Morris v.*

13

*California*, 966 F.2d 448, 456 (9th Cir. 1991) ("heavy speculation" and "willful suggestions cannot substitute for declaratory or other evidence").

## ARGUMENT

### I. PETITIONER FAILED TO PROVE, FACTUALLY, THAT EVIDENCE WAS AVAILABLE TO TRIAL COUNSEL TO PROVE THE CRIMES OCCURRED WHEN PETITIONER WAS AT HOME

Trial counsel had no good options available. Overwhelming evidence placed Petitioner at the burglary-murder scene, including his admissions to friends that he killed a person for money on the very day that a person was killed for money by a single gunshot, on the very day he borrowed a shotgun and returned with the admission that he fired it, on the very day three young men purchased shotgun ammunition—two of them having admitted they were part of that very same burglary-murder.

The Supreme Court has rejected specific constraints on counsel's elections, despite lower courts repeatedly feeling that some thing or other different just had to be done, based on hindsight knowledge that the defense strategy ultimately just did not prevail. In flat refutation of specifics, that Court has held the Constitution imposed but "one" requirement, and an expressly "general" one, i.e., "that counsel make objectively reasonable choices." *Roe*, 528 U.S. at 479 (state law is no basis for constitutional specifics); *see Van Hook*, 558 U.S. at 9 (nor are the ABA's views).

14

So, any argument that counsel's virtually-unchallengeable province required taking a particular course in this case would falter at the outset. And the additional facts just make it worse. At the time of trial, counsel learned this case wasn't quite the one he had originally prepared for, in that his alibi evidence was primarily for a timeline that the prosecution no longer believed it to be. Surely, in a way, that was worse than expected.

Some counsel might seek a continuance to look for more evidence for an alibi for the earlier timeline. But, as the federal evidentiary hearing showed, counsel had already sought evidence about the earlier times, without success in nailing down good proof. To explain why a continuance was proper, he could expect candidly to admit such efforts had already been made and had failed—so it is hardly proven affirmatively that every rational attorney had to think there was a decent chance a continuance would be granted. And there was a lurking problem with any such alibi insofar as jurors would need to credit Petitioner. Jurors would hear (and given state disclosure rules, counsel had to know as much) Petitioner previously had falsely denied guilt of a more minor crime based on a fabricated, telephone-records-based alibi, so the inference was obvious that he would be willing to do so on exceedingly severe current charges.

15

But in another way, things arguably had gotten better. The only cohort who had some recall about the timeline had changed his story about it, and he also conveniently was doing so with the benefit of a plea agreement. If there was a decent argument that he was lying about his change in timing, then the alibi evidence in hand about the original timeline was still useful. Even better, a theme that a chief witness for the prosecution had lied, and especially based on the prosecution negotiating with him to testify against Petitioner, just might cast a pall on all the rest of the prosecution's witness. *See Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) ("A witness who appears shifty or biased and testifies to X may persuade the jury that not-X is true, and along the way cast doubt on every other piece of evidence proffered by the lawyer who puts him on the stand."). And a settled point is that "an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693.

Despite being granted a federal evidentiary hearing, Petitioner did not produce credible evidence that the only objectively reasonable option was to seek a continuance to make more efforts concerning an earlier timeline. Nor did he produce credible evidence, shown to be available to counsel at the time of trial, that between 10:12 and 11:24 AM he could not have been away from his home as part of the burglary-murder that the prosecution evidence

16

overwhelmingly showed that he in fact was part of.  The District Court

found that some alleged evidence was unavailable at trial, and other

evidence did not place Petitioner at home during that period.  Petitioner's

failure to show that was clear error bars the writ.[6]

### A.   If Wellman Saw Multiple Guns Moved in the Gun Store, That Could Have Been at About 10:25 AM

There is no dispute that Wellman said he saw guns being moved in the

gun store.  Petitioner argues store employee Gilmore proved such movement

could only have been at 10:00 AM when the store opened, so trial counsel

had no constitutional choice but to make Gilmore a defense witness because

at 10:00 AM Petitioner was at home.  (AOB-18–23.)  But Gilmore said such

movement could occur at any time during business hours.  (3-ER-279–80.)

The day after trial commenced, trial counsel learned via a discovered

report that, pretrial, regarding the gun shop:

Wellman said he recalled an employee behind the counter placing

---

[6] Additionally, Petitioner raises an ineffective assistance of counsel claims which he never raised until after the evidentiary hearing: Clark failed to ask Carrick whether he would invoke his Fifth Amendment rights with regards to the 11:14 a.m. phone call.  Petitioner's new claim is procedurally barred, but also meritless because it is based on faulty interpretations of state and federal law.

Petitioner also claims Wellman admitted to committing perjury at trial at the evidentiary hearing.  (AOB-51–62.)  That claim is outside of the scope of the certificate of appealability and therefore will not be addressed by Respondent.

guns in the display case and a middle-aged customer talking to another employee about an upcoming hunting trip.

(Lod. Doc. 11, Exhibits at 185.)

At trial, gun shop employee Carl Christofferson testified that, in 2003, he opened the store on weekday mornings at 10:00 a.m. He recalled selling a box of shotgun shells in February 2003 to a tall young man who was accompanied by two younger and shorter men. The transaction took place right after the store opened at 10:00 a.m., and the men were the "first ones in the door." (ECF No. 16-1 at 198; 5 RT at 1099.) In his closing statement, the prosecutor Alexander argued that Christofferson's testimony corroborated Wellman's testimony that Wellman, Dickson, and petitioner bought the shells used in the shooting at the Big Horn Gun Shop on the day of the murder. Alexander also argued that Christofferson's recollection of the timing was vague, "in the range" of 10:15 to 10:45. (7 RT 1662-1663.) Petitioner asserts that Clark should have called Gilmore to testify, placing Wellman at the gun shop at 10 a.m., when petitioner had an alibi.[8]

> [N.8] As the Ninth Circuit summarized, "The State's theory was that the murder occurred between 10:30 a.m. and 11:30 am. Obrien had a solid alibi, which the State did not contest, establishing that he was at home throughout the period both before and after that one-hour window." (ECF No. 43 at 7.)

At the evidentiary hearing, Gilmore testified that, in February of 2003, he had worked at the Big Horn Gun Shop for about five years. He described the daily process of opening the store: Staff would arrive and unlock the building between 9:30 and 9:45 a.m. "We kept the handguns locked up, so next procedure was to unlock them from their storage, put them out in the display case." This process took five minutes and occurred before the public was allowed inside. After placing money trays in the cash register, staff would open the front doors to the public at 10 a.m. At night, staff took the handguns out of the display cases in trays and locked them in a secure container. (EHRT 22-24.)

Q: So outside the procedure of putting the guns in the display

case in the morning, were guns ever taken in and out of the display case at any other time during the day?

A: Absolutely.  Just about every time we had a customer.

Q:  So when you had customers, they would ask for a gun, gun would be taken out, you'd show it to them.

A: Yes, sir.

Q: And then it would be put back?

A: Yes, sir. …If they wanted to see one, they saw it.  If they wanted to see another, put it back and get another out.

Q: There could be guns moving in and out of the display case at any time during the day?

A: Yes, sir.

(EHRT 26-27.)  Gilmore further testified that, before the store opened, the guns were moved into the case in trays, but would be taken out for customers "generally one at a time."  (EHRT 28.)  Gilmore confirmed that Clark never asked him to testify at trial.  (EHRT 28.)  At the evidentiary hearing, Wellman could not remember anything about guns being placed into the case at the gun shop.  (EHRT 197-198.)  Clark testified that, because he called Christofferson, who was working on the day of the shooting, as a witness, there was no need to also call Gilmore, who was not at the shop that day.  (EHRT 146.)

In post-hearing briefing, petitioner argues that Gilmore's testimony would have established that "Wellman entered the gun shop at precisely 10, when handguns were being placed into the display case," thus establishing that Wellman "lied about O'Brien being at the gun shop."  (ECF No. 83 at 15-16.)  However, Gilmore's testimony is consistent with Wellman seeing "an employee behind the counter placing guns in the display case and a middle-aged customer talking to another employee about an upcoming hunting trip" at some point later than 10 a.m.  According to Gilmore, the guns already would have been in the

> display case when the shop opened to the public, but a gun could have been removed from, and returned to, the case at any time if requested by a customer.
>
> Because Gilmore's testimony does not establish what time Wellman arrived at the gun shop, Clark's failure to call him as a witness does not constitute ineffective assistance, nor has petitioner shown prejudice.

(1-ER-11–14.)

To contest that, Petitioner argues the written report refers to moving "guns," plural, and that moving multiple guns would only be at 10:00 AM. (AOB-22–23.) But Gilmore said gun movement at other times was "generally" one at a time, not always. So Petitioner's theory lacks support on its face. Moreover, the hearing was an opportunity for him to present testimony from Wellman that he saw movement of guns, plural. Yet Wellman had no such recall. (3-ER-451–52.) Thus, a theory that in fact he saw guns, plural, moved lacks a basis in competent and credited evidence.

### B.   Unavailable at Trial Was Testimony That Petitioner Called the Autobody Shop at 10:49 AM

Petitioner claims that Winslow could have testified that Petitioner called his mother's autobody shop at 10:49 AM that day, so Winslow had to be a witness. (AOB-23–26.) But Winslow did not tell counsel such a time.

> As set forth in the April 16, 2014 order in this action: "In a declaration submitted in support of Petitioner's motion for a new trial, Winslow stated that he was at the shop's front desk helping a

20

customer at 10:49 a.m., as evidenced by the customer's credit card receipt stamped at that time." The court then noted the following excerpt:

> While I was processing Ms. Sirmak's credit card at the front desk, or very soon afterwards, Sean O'Brien called on the telephone. When I picked up the telephone, Sean said, 'Is my mom there?' His mother, Deborah O'Brien, was outside the lobby in the parking lot talking to a customer. I told Sean I would get her, and put the call on hold. I then went outside and told Deborah that Sean was on the phone.

> Sometime prior to Sean's trial in February 2004, Sean's lawyer, James Clark, called me on the telephone at the garage…. At that time I was dealing with cashing out customers who had come to pick up their cars and trucks. My entire conversation with Clark lasted about one minute. Clark asked me if Sean had called the garage on the morning of February 26, 2003, the day of the crime. I told Clark that Sean had called. Clark asked me when Sean had called. I told Clark that off the top of my head I thought it was between 9:30 and 11 a.m. and that I was very busy but if I had a chance to look at the paper work from that morning I could be more precise. Clark responded that if I wasn't sure when Sean had called, he couldn't use me as a witness. That was the end of the conversation.

(ECF No. 31 at 2, citing 7 CT 1757-1758.)

At trial, petitioner testified in his own defense. In recounting events on the day of the shooting, he never mentioned calling the auto shop or talking to Winslow on the day of the murder. When questioned by police, petitioner stated that he had returned his friend Frank Silici's call at 10:45 a.m. but did not mention a call to the shop. (6 RT 1278-1279; 1 CT 289-290.) In her trial testimony, Deborah O'Brien, petitioner's mother, did not mention any call by petitioner to her shop on the morning of the shooting. (6 RT 1419-1441.)

At the evidentiary hearing, Winslow testified as follows: In February 2003, he was employed as the service manager at

21

Cameron Park Automotive. (EHRT 31-32.) After the shooting, Clark asked him about the morning of February 26, 2003, and Winslow told Clark that petitioner called between 9:30 and 11:00 a.m. (EHRT 36.) Winslow recalled this conversation with Clark taking place over the phone. (EHRT 57.) Clark told him he would not need to testify at trial because "since I worked for Debbie,… people probably wouldn't believe me." (EHRT 37.) Clark never called Winslow to testify at trial. (EHRT 47.)

Winslow further testified at the hearing that, in February 2003, petitioner called the shop every day "about 10 o'clock" to speak to his mother, and Winslow recognized his voice. (EHRT 39, 55.) Winslow didn't mention to Clark that petitioner called the shop every morning, because Clark "didn't ask." (EHRT 57.)

Winslow worked for petitioner's mother, and after petitioner's arrest, they discussed his upcoming trial every day. (EHRT 54.) After the trial began, Winslow "was concerned that they didn't ask me to be a witness because I know he [petitioner] called then." (EHRT 59.) Near the end of the trial, he stated, Clark came to the body shop, and Winslow asked to speak to him a second time in the back room. (EHRT 59.)

> Q: And what did you tell him there?
>
> A: I said I know Sean called that morning, and I wanted, you know, to testify if I can. And he told me I'm not needed.
>
> Q: Did you tell him what time –
>
> A: Yeah.
>
> Q: - he called that morning?
>
> A: Right. I told him.
>
> Q: You told him it was at 10:49?
>
> A: I told him it was sometime between 10:00 – or 9:30 and 11:00.

Q: You told him sometime between 9:30 and 11:00?

A: Right.

Q: So you told – so you didn't give him any more details about what time it was?

A: No.

Q: <u>So you hadn't looked at the service records at that time?</u>

A: <u>No.  I looked at the records later.</u>

…

Q: <u>So the first time you looked at the records was after the trial?</u>

A: <u>Yes.</u>

Q: <u>And that was with a private investigator?</u>

A: <u>Yes.</u>  But I didn't need the records during the trial because it was so fresh in my memory.  I knew he called at that time, so I didn't really need –

Q: Between 9:30 and 11:00?

A: Yeah.  Right.

(EHRT 59-60; emphasis added.)  Later in his testimony, Winslow confirmed that he "couldn't pinpoint [the] exact time" of petitioner's call when he spoke to Clark.  (EHRT 68.)

The records in question were shop records from the morning of the shooting.  They included a February 26, 2003 invoice for customer Joan Sirmack, who authorized work at 10:16 a.m. (EHRT 40-41; E612.)  Winslow testified that the call from petitioner came "right around" when he was standing at the counter helping Ms. Sirmack, "because prior to that I was not at the counter."  (EHRT 41-43.)  Winslow cited records for a second customer he helped that day, Andy Beale, whose work sheet was stamped 10:42 a.m. (EHRT 43-44; E615.)  Lastly, he cited a

23

receipt of sale for Ms. Sirmack printed at 10:49 a.m. (EHRT 44-45; E617.) Having reviewed these documents, Winslow testified that they refreshed his recollection that petitioner called him "[b]etween 10:16 and 10:49" on the day of the shooting. (EHRT 45-46.) After being shown his declaration, he revised the timing of the call to "[r]ight before 10:49." (EHRT 46.)

In June 2004, after petitioner's conviction at trial, a private investigator for the defense suggested that Winslow review the shop records from February 26, 2003 "to help trigger a memory" of exactly when petitioner called that day. (EHRT 61, 63.) Winslow testified that seeing these records "brought the whole day back, so I could really pinpoint the time [of the call] from seeing that schedule… It really helped." (EHRT 61.) He testified that petitioner "could have called… between 10:15 and 10:49, because those are the times I was by the phone," i.e., helping Joan Sirmack as reflected in the records. (EHRT 61-62.) Nearly two years after reviewing these records with the investigator, in February 23006, Winslow signed a declaration stating that "[w]hile I was processing Ms. Sirmak's credit card at the front desk, or very soon afterwards, Sean O'Brien called on the telephone." (EHRT 63-64; see 7 CT 1757-1758.)

At the evidentiary hearing, Clark testified that Winslow called him and said that he "received a phone call from Sean on the morning of the murder" but could not "give me a specific time." (EHRT 152-153.) Clark testified that when he pressed Winslow for a "definite time" for the call, Winslow "[hemmed] and hawed. And I said, Okay, that's fine, Ned. I can't use you." (EHRT 153.) "I was grinding him, you know, tell me what you got," Clark said of his call with Winslow. (EHRT 155.) "There was nothing. I mean, there was nothing like, Geez, Jim, I can go back and reconstruct my time to a given time. It was nothing like that at all… [W]hat I primarily remember was he was hemming and hawing as to specificity as to the time of the call. And, you know, I'm a bottom line type of guy. I didn't get that, I wasn't interested." (EHRT 153.)

After trial began and the alleged time of the shooting suddenly

shifted to between 10:30 and 11:30 a.m., Clark did not further investigate Winslow's statement. (EHRT 158.) He had no recollection of Winslow calling or approaching him during the trial or "saying that he remembered a specific time Mr. O'Brien had called him that morning[.]" (EHRT 160.) There were no phone records of a call from petitioner's house to the body shop that morning, Clark testified, but his understanding was that no record of a local call would have existed either way. (EHRT 162.)

Overall, the evidence adduced at the evidentiary hearing was inconsistent with Winslow's 2006 declaration, which stated that Winslow told Clark "that off the top of my head I thought it was between 9:30 and 11 a.m…. but if I had a chance to look at the paper work from that morning I could be more precise." (CT 1758.) Nothing in Winslow's testimony indicates that he offered to "look at the paper work… to be more precise" when he spoke to Clark, or that this idea had even occurred to him at that time. Rather, a defense investigator hired by Ms. O'Brien after the trial suggested that Winslow peruse receipts dated February 26, 2003 in an attempt to pin down when petitioner might have called.

Given that Winslow could only provide a 90-minute window for the phone call before trial and there was no other evidence that petitioner called the shop that morning at all, Clark's decision not to call Winslow did not constitute deficient performance, nor has petitioner shown prejudice as a result of this decision.

(1-ER-15–19.)

Petitioner argues that the Magistrate Judge cannot be trusted because she did not consider all the evidence. He cites to portions of the transcript where Winslow is directly refreshed with his declaration, and argues that "the Magistrate never addressed these facts." (AOB-26.) But a court "need not make detailed findings addressing all the evidence before it." *Miller-El*

25

*v. Cockrell*, 537 U.S. 322, 347 (2003). And the Magistrate Judge did not say it refused to consider such evidence. *See Larita-Martinez v. I.N.S.*, 220 F.3d 1092, 1095 (9th Cir. 2000) (citing *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986) ("We presume that a fact finder reviews all the evidence presented unless [it] explicitly expresses otherwise.")); *cf. Early v. Packer*, 538 U.S. 3, 9 (2002) (judicial duty to consider all matters does not imply duty to make "formulary statement" that it performed that duty). And all the more so, where Petitioner briefed that evidence to the Magistrate Judge. *See United States v. Yazzie*, 743 F.3d 1278, 1290 n.6 (9th Cir. 2014). The Magistrate Judge noted various inconsistencies in Winslow's testimony, making findings from it as a whole. (*See* 1-ER-16–17.) It is irrelevant that Petitioner thinks certain parts more telling. *See Intel Corp. v. Terabyte Intern., Inc.*, 6 F.3d 614, 622 (9th Cir. 1993) (determining the weight and credibility of the evidence is the special province of the trier of fact).

Further, Clark testified that he thought Petitioner's mother had "put Winslow up to" telling Clark that Petitioner called the auto shop the morning of the murder. (3-ER-414.) Clark had a good basis for this belief: he knew that Petitioner's mother had provided alibi evidence for Petitioner for crimes to which Petitioner later admitted guilt. (3-ER-414–15.) And Clark could not recall Petitioner ever mentioning such call to Clark. (3-ER-422–23.)

26

Clark was not compelled to present what he had plausible reason to think was perjury. *See Nix v. Whiteside*, 475 U.S. 157, 166 (1986); *Mann v. Ryan*, 828 F.3d 1143, 1153 (9th Cir. 2016). And that was reason think Winslow might admit that lie on cross-examination—so to "cast doubt on every other piece of evidence proffered by" trial counsel. *See Lord*, 184 F.3d at 1095.

There could also be no prejudice from Winslow's lack of testimony that Petitioner called sometime between 9:30 and 11:00 AM. That would not disprove the timespan available for the crime. And the evidentiary hearing did not include evidence that Petitioner would have, or that his mother even could have, testified to greater specificity—even assuming the defense would risk the prosecution hammering home that jurors were being treated to a stark reprisal of the two of them concocting a false alibi.

### C. There Was No Evidence That the Trip Could Not Have Taken Less than Forty-Seven Minutes, Nor That Such a Timespan Would Disprove Petitioner's Participation

Petitioner claims Wellman could have testified Petitioner lacked a cell phone and made no calls in his presence, the theory being that Petitioner could only make calls from home. Because Detective Hoagland drove one route (at lawful speed) in forty-seven minutes, Petitioner argues there was a basis to tell jurors the cohorts took that route, and that Petitioner could not have been away from home for forty-seven minutes. (AOB-26–39.) But the

27

evidentiary hearing did not show Wellman could have personal knowledge that Petitioner lacked a cell phone, much less if Petitioner made calls *outside* of Wellman's presence. Nor did the hearing include testimony from anyone, from personal knowledge, as to the route the cohorts traveled, much less that those who had just committed most severe crimes had suddenly become so law abiding as to drive only at lawful speed. And, as noted, even a forty-seven-minute trip, ending at 10:58 AM, would not disprove that Petitioner could have participated, and overwhelming evidence showed he did.

The Magistrate Judge summarized the claim and relevant background in denying Petitioner's claim:

> Wellman, who was serving a term for second-degree murder pursuant to his plea bargain, testified at the hearing. He described his January 2, 2004 meeting with Detective Hoagland, prosecutor Joe Alexander, and other law enforcement members to go over the details of the shooting. (EHRT 192-196.) The meeting followed Wellman's July 2003 entry of a plea to second degree murder premised on his cooperation with the prosecution. (EHRT 187.)
>
> At the hearing, Wellman confirmed that he told Detective Hoagland at the meeting that petitioner didn't have a cell phone and didn't make any phone calls in Wellman's presence on the day of the shooting. (EHRT 196-197.) Detective Hoagland noted these statements in his report. (E 193.) While Petitioner argues that Clark was ineffective for failing to adduce this information at trial, it is unclear how it would have helped petitioner's case. There was no evidence at trial that petitioner made calls from a cell phone and/or made calls in Wellman's presence. In fact, Frankie Silici, who said that he and petitioner had been good friends for years and spent time together daily, testified that

28

petitioner did not own a cell phone at the time of the shooting. (3 RT 512-513, 533.) Thus, any testimony to this effect by Wellman would have been cumulative. See Clabourne v. Lewis, 64 F.3d 1373, 1382 (9th Cir. 1995) (failure to present cumulative testimony does not amount to ineffective assistance). While the jury heard the times that Wellman claimed to be at petitioner's house on the day of the shooting, Wellman did not testify that petitioner made any calls in his presence.

Petitioner argues that testimony from Wellman that "O'Brien never used the telephone while he was supposedly in O'Brien's house would have established that Wellman and Dickson, if there at all, arrived at O'Brien's house *after* the 10:30 a.m. telephone conversation between O'Brien and Michaud." (ECF No. 83 at 20-21.) Frankie Silici testified that he called petitioner at 10:11 a.m. on the morning of the shooting, as corroborated by phone records introduced at trial. (3 RT 547.) But no phone bill or other evidence corroborated Michaud's claim that she talked to petitioner at "about 10:30 a.m. in the morning" (3 RT 563), and the jury could have reasonably inferred that one or more witnesses were mistaken or imprecise about the timing of events that morning.[10] The prosecutor argued that the trio could have arrived at the gun shop as early as 10:15 a.m. (RT 1663), implicitly suggesting that the call between Michaud and petitioner took place earlier that morning. In light of the above, any testimony by Wellman that petitioner didn't use the phone in his presence would not establish facts about the timeline that would have likely changed the outcome.

[N. 10] See 2 RT 374 (Wellman testified that he and Dickson spent 30-40 minutes at petitioner's house on the morning of the shooting, but he was not wearing a watch on the day of the shooting and "had no place to be, so I wasn't really keeping track of time"); 3 RT 565 (Michaud testified that she did not recall how long she talked to petitioner that morning and didn't "really remember the pieces of conversation from a year ago"); 7 RT 1571 (Dickson testified that he and Wellman spent "[n]ot long at all, maybe between five and ten minutes" at petitioner's house on the morning of the shooting).

The Hoagland Report noted that Wellman "recalled an employee
behind the counter placing guns in the display case and a middle-
aged customer talking to another employee about an upcoming
hunting trip." (E194.) Petitioner argues that Clark's failure to
present this information at trial prejudiced him. However, as
discussed above, Wellman's witnessing of a store employee
returning guns to a case could not establish what time Wellman
was at the shop. As Gilmore explained, guns could have been
brought out at the request of a customer at any time during the
day, and then returned to their cases. At the hearing, Wellman
testified that he had no memory of "an employee… behind the
counter placing guns in a display case," though he did not dispute
what was written in the Hoagland Report. (EHRT 199-200.)

The Hoagland Report further noted that "Wellman was…
uncertain on the exact route they drove to and from the victim's
residence," though he recalled "travelling on Green Valley Road
when they left Treasure Lane" and also driving past "the Wal-
Mart on Forni Road." (E194.) After Wellman's statements,
Detective Hoagland experimentally drove between petitioner's
house, the gun shop, the victim's house, and back to petitioner's
house at the posted speed limit, allowing five minutes to purchase
shotgun shells and five minutes to enact the shooting.[11] He
noted in the report that this route (the "Green Valley Road" route)
resulted in a travel time of 47 minutes. (E195.)

> [N. 11] At the hearing, the parties stipulated that "Detective
> Hoagland drove the route described in the report contained at
> pages E195 of Petitioner's exhibit based on the information
> Wellman gave Hoagland detailed in the report on pages E193 to
> E195." (2 EHRT 4.)

At trial, Hoagland testified that he drove three different routes
between petitioner's house, the Big Horn Gun Shop, the victim's
house, to the pond on Forni Road, and back to petitioner's house.
(5 RT 1125-1132.) On each drive, he drove the posted speed limit
and obeyed all traffic signals, pausing briefly to approximate the
time spent buying the ammo, the robbery and shooting, and
throwing the gun into the pond. (5 RT 1129.) Hoagland testified

that the first two routes took between 36 and 40 minutes, factoring in a 30-second stop to purchase shells. (6 RT 1128-1131.) He testified that, driving the third route (The Green Valley Road route), he paused "five full minutes" at the gun shop, and the route took approximately 47 minutes. (5 RT 1131-1132.)

Petitioner argues that Clark rendered ineffective assistance by failing to ask Hoagland which of the three routes he drove was based on Wellman's statements in the Hoagland Report, presumably because this would establish that the drive took 47 minutes. Petitioner maintains that, because there was no 47-minute gap between petitioner's phone calls, this evidence would prove he did not accompany Wellman and Dickson to the shooting. His argument goes as follows: On the morning of the murder, using his home phone, petitioner spoke with Silici at 10:11, Michaud at 10:30, and Carrick at 11:14, such that the longest "gap in his alibi" between calls lasted 44 minutes, and the Hoagland Report proved that the driving route took 47 minutes; thus, petitioner could not have participated in the crime.

However, the purported three-minute difference between the time needed to drive the Green Valley Road route and the 44-minute gap between petitioner's calls is based on approximations, not established facts. As discussed above, there was no evidence that Michaud spoke to petitioner at "about 10:30 a.m. other than her and petitioner's statements. (6 RT 1279.) Moreover, as discussed below, petitioner failed to produce any admissible evidence besides his own trial testimony that he called Carrick at 11:14 a.m. Petitioner testified that he called his friends Richard Lacerte and Richard Anshutz around 11:30 a.m. (6 RT 1281), which was reflected in phone records. (3 RT 624, 629, 634.) But, given the uncertain timing of the other calls that morning, petitioner fails to show how testimony as to the driving routes mentioned in the Hoagland Report would entitle him to relief.

At the evidentiary hearing, Clark testified that he thought all three routes Detective Hoagland timed fit within the gap in the phone records in which petitioner arguably had no alibi, and "I was definitely worried about it." (EHRT 166.) Clark testified that it

also wasn't entirely clear which route was taken, because "what Wellman said [to Detective Hoagland] wasn't all that specific." (EHRT 166.)  Harboring doubts as to admissibility, Clark testified, "I just – I felt it was a loser so I let it go."  (EHRT 167.)

Having reviewed the various pieces of allegedly exculpatory evidence in the Hoagland Report as urged by petitioner, it does not appear that Clark's eliciting testimony on any one of them, or all of them, would have established an alibi for petitioner during the crucial gap between his objectively verifiable phone calls that morning.  Petitioner has not shown deficient performance or prejudice as to Claim 6(e).

(1-ER-19–23.)

Petitioner argues from two unfounded factual premises that (1) his call to Michaud was at 10:30 AM and (2) Wellman was at Petitioner's home at least thirty minutes before and after the robbery.  Neither Michaud (1-SER-9–10) nor Wellman (1-ER-21) claimed to know those things, so some rational attorney could doubt jurors would think they were so.[7]  The Magistrate Judge even noted prosecution argument that the cohorts could have arrived at the gun shop at times implied the call to Michaud call was earlier than 10:30 AM.  (1-ER-20–21.).)  And it is implausible that jurors would believe a defense theory that there was an innocent explanation why the only time period for which documented calls for Petitioner was lacking,

---

[7] Indeed, Dickson was sure the cohorts were at Petitioner's home for much less time.  (1-ER-21.)

somehow just happened to be a period that fit with him being absent from home as part of a burglary-murder that other overwhelming evidence showed he was part of.

### D.   Petitioner Did Not Prove He Called Carrick at 11:14 AM

Petitioner claims trial counsel had to proffer Mike Carrick's cell phone record showing an incoming call from an unknown number at 11:14 AM. (AOB-39-48.)  He also claims counsel had to either (a) argue to admit evidence that Carrick told police that Petitioner called at around that time, or (b) ask Carrick specifically if he would invoke a self-incrimination privilege as to whether Petitioner made the 11:14 AM call, despite Carrick saying it was invoked for "all" purposes.  (AOB-42–44.)  The last factual allegation is barred.  In any event, the claim cumulatively presented is frivolous.

The record shows an incoming call, but has no tendency in reason to show Petitioner made that call.  And in the hearing below, he admitted no statements or testimony from Carrick as to who made the call.  Nor does Petitioner demonstrate Carrick had to testify if asked certain questions, or a hearsay exception to admit Carrick's pretrial statements.

> The Fifth Amendment privilege embraces not only "answers that would in themselves support a conviction," but also those that "would furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime."  (*Hoffman v. United States* (1951) 341 U.S. 479, 486 [] (Hoffman); . . . .)  The privilege "must be

accorded liberal construction in favor of the right it was intended to secure." (*Hoffman*, at p. 486 [].)  This protection is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." (*Ibid.*)  "However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee.  To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.  The trial [court] in appraising the claim 'must be governed as much by [its] personal perception of the peculiarities of the case as by the facts actually in evidence.' " (*Id.* at pp. 486-487.)  It must be " '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." (Id. at p. 488 [].)

*People v. Silveria*, 10 Cal. 5th 195, 296 (2020).

The opening brief asserts Carrick's answer would have been "that O'Brien called Carrick at 11:14, while Carrick was still in school."  (AOB-43–44.)  But the opening brief conspicuously provides no citation to where the Excerpts of Record proves that, such that the Magistrate Judge had to accept that as true.  That is fatal, without need for more.[8]

---

[8] *See* 9th Cir. R. 28-2.8 ("Every assertion in the briefs regarding matters in the record, except for undisputed facts offered only for general background, shall be supported by a citation to the Excerpts of Record, unless the filer is exempt from the excerpts requirement.").

But, worse, even were that Carrick's answer, that would have been a testimonial assertion by him that he was in contact with Petitioner that day, which certainly could be a link in a chain to proving criminal conduct by Carrick. The opening brief provides no record citation setting forth facts that make it "*perfectly clear*" that no evidence could come to light that would tend to show that Petitioner was not calling in relation to criminal conduct. Even his own assertion to this Court is that "the call was to discuss smoking marijuana later that afternoon," with his theory that that could not be a basis for prosecution. (AOB-47.) Of course, "[a] witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry." *Mitchell v. United States*, 526 U.S. 314, 321–22 (1999). But Petitioner is wrong even more fundamentally on the law.

He overlooks that possession of marijuana, a "controlled substance," is a federal crime "except as authorized under the Controlled Substances Act." *Raich v. Gonzales*, 500 F.3d 850, 855 (9th Cir. 2007). He overlooks that it is a crime in California to conspire to commit "any" crime. *People v. Vu*, 143 Cal. App. 4th 1009, 1024 (2006). And of course, the opening brief does not cite to where the record proves facts that make it perfectly clear that a post-crimes call from Petitioner to Carrick could not furnish a link in a chain

35

to show he actually was part of planning the criminal venture in the first place.  Indeed, Dickson testified that it was Carrick who put Dickson in touch with Petitioner to drive Petitioner to Smelser's house for the robbery.  (1-SER-222.)  Petitioner's argument as to privilege is frivolous.

His argument as to hearsay—any out-of-court statement by Carrick, offered for its truth, Cal. Evid. Code § 1200(a)—is likewise frivolous.  He fails to identify a hearsay exception, Cal. Evid. Code § 1200(b), that "no competent attorney would think . . . would have failed," *see Premo v. Moore*, 562 U.S. 115, 124 (2011) (that is "the relevant question under *Strickland*").[9]

Last, it just did not matter, for Petitioner being at home at 11:14 AM was not inconsistent with having participated at the scene as demonstrated by other evidence.

The Magistrate Judge summarized the claim and relevant background in denying Petitioner's claim:

> In his opening statement at trial, Clark told the jury he would present evidence that at 11:14 a.m. "O'Brien called a gentleman by the name of Mike Carrick.  That will be documented, I believe,

---

[9] In post-evidentiary hearing briefing, Petitioner suggested Carrick's out of court statements could have been admitted under Cal. Evid. Code § 1350.  (1-ER-213.) The Magistrate Judge found the claim procedurally barred and meritless.  (1-ER-11, 28.)

by phone records and/or testimony." (2 RT 343.)

At trial, petitioner testified: "I called Mike Carrick at some time that morning and he called me back about 11:14, 11:15, sometime in there." (6 RT 1281; emphasis added.) Petitioner testified that he contacted Carrick because Carrick was "going to come over that afternoon… to hang out, smoke some pot." (6 RT 1281.) No phone records were introduced in support of this testimony.

Prior to trial, Clark obtained Carrick's cell phone records, which showed an incoming call at 11:14 a.m. on the day of the shooting, but did not indicate what number the call came from. (EHRT 106, 7 CT 1775.) The phone log also showed an incoming call to Carrick's phone at 11:47 a.m. (7 CT 1775.) Meanwhile, J.D. Petty's phone records showed an outgoing call to Carrick's phone number at 11:47 a.m.[12] (9 CT 25423.)

> [N. 12] Petty testified at trial that he called Carrick's cell phone at 11:47 a.m. (3 RT 698-699.)

In a March 5, 2003 taped interview with Detective Hoagland and Moschini, Carrick stated that on the day of the shooting, petitioner called him at school "[p]robably around 11:15, 11:30, somewhere right around there[.]" (9 CT 2329.) In an August 9, 2006 declaration, Carrick stated that he "did not remember the time of the phone call" but that in 2005, in connection with petitioner's state habeas case, he had inadvertently signed an attorney-drafted declaration stating that the call took place at 11:14 a.m. (9 CT 2401.) In his 2006 declaration, Carrick clarified:

> That is not correct. I cannot say what time I received the phone call. In fact, if pinned down, I would have to say the phone call was later that morning because I remember getting out of school shortly after the phone call. At that time I was getting out of school at 12:00.

(9 CT 2401.)

> [N. 13] At the evidentiary hearing, Clark acknowledged that he didn't introduce a phone record showing that Carrick called

petitioner on his home phone at 11:44 a.m. on the day of the shooting. EHRT 173-174. While this would have established that petitioner was home at 11:44 a.m., the jury heard evidence that petitioner spoke to Anschutz by phone ten minutes earlier. A second call at 11:44 a.m. would not establish an alibi during the key time, earlier in the day.

In his March 2003 interview with Detectives Hoagland and Moschini, Carrick stated that petitioner described the robbery to him "after he did it, he like showed me the money and is like I went up to the house and I robbed it and got this money… and he had a little chuckle about it." (9 CT 2308-2309.) Carrick stated that petitioner told him he had been to the Treasure Lane house once or twice, and that it was up on a hill and an "easy spot." (9 CT 2308-2309.) Carrick stated that petitioner showed him $2,600 that he took from the house, and they counted the money together. (9 CT 2309.) Carrick stated that petitioner told him that he, Tyler Dickson, and William Wellman drove to the house, knocked on the door, and when no one answered, they kicked the door in. (9 CT 2361.) Carrick stated that petitioner told him he had a shotgun during the robbery. (9 CT 2363.) Carrick told Hoagland and Moschini that petitioner recounted how he shot Smesler when Smesler confronted him with a rifle, and then petitioner, Wellman, and Dickson took money from the house. (9 CT 2363-2364.) Carrick stated that petitioner used the money from the robbery to buy marijuana from Carrick's cousin. (9 CT 2336-3227.)

At the evidentiary hearing, Clark stated that he wanted Carrick to testify at trial, but that Carrick's counsel indicated that Carrick would be "taking the Fifth [Amendment] for all purposes." (EHRT 129-131; see 4 RT 893-895.) Clark believed that Carrick's invocation of his Fifth Amendment privilege meant "the analysis and the inquiry is over," and so did not press for Carrick's testimony about the 11:14 a.m. phone call from an unknown number. (EHRT 134-135.) Clark further testified at the hearing that he did not ask Detective Hoagland about the statements Carrick made in his March 2003 interview because Clark believed those statements were inadmissible hearsay. (EHRT 138-139.)

38

Petitioner argues that Clark was ineffective in accepting Carrick's "blanket assertion" of his Fifth Amendment privilege against self-incrimination, which petitioner asserts is contrary to California law.  See People v. Trujeque, 61 Cal. 4th 227, 267-269 (2015) ("A witness… may not make a blanket assertion of the privilege against self-incrimination.")  In Trujeque, however, the California Supreme Court explained that "a trial court may reject an assertion of the privilege only when it appear to the court *perfectly clear*, from a careful consideration of all the circumstances in the case, that … the answer[s] cannot *possibly* have [a] tendency to incriminate."  Id. at 267 (emphasis in original), citing Cal. Evid. Code section 404.  At trial, Carrick invoked the privilege in response to possible questions about the destruction of evidence; his "knowledge and participation of the purchase of a large sum of marijuana" around February 26, 2002; his theft of money from an ATM machine; his participation and/or knowledge of thefts from an ATM account owned by Deborah O'Brien; and involvement with Tyler Dickson and Kyle Ruben.  (4 RT 893-895.)  After these potentially incriminating topics were raised and Carrick invoked the Fifth Amendment for each one, his attorney confirmed that he would be "taking the Fifth for all purposes."  (4 RT 895.)

Though he was not specifically questioned about it, Carrick's phone conversation with petitioner on the day of the shooting was also potentially incriminating: not only could it have linked him to the knowledge of a robbery and murder, but petitioner testified that he phoned Carrick so that the two of them could (illegally) smoke marijuana that afternoon.  (6 RT 1281.)  Petitioner also testified that, later that day, he, Carrick, and a third person (illegally) purchased $2,000 worth of marijuana.  (6 RT 1286.)  It was reasonable for Clark to believe that Carrick's invocation of his privilege against self-incrimination would extend to his communications with petitioner on the day of the murder, including any phone calls between them.  If Carrick had testified that such a call occurred, it could have opened him up to cross-examination on the nature of the call, i.e., potentially incriminating questions.  Assuming arguendo this argument is not procedurally barred, as discussed supra, petitioner has not shown deficient performance under Strickland on this basis.

39

Petitioner next claims that Clark was unreasonable in not asking Detective Hoagland about Carrick's March 2003 interview, in which Carrick stated that petitioner called him "[p]robably around 11:15, 11:30, somewhere right around there" on the day of the shooting. (9 CT 2329.) While Clark believed such statements were inadmissible hearsay, petitioner argues that they fell under the "unavailable declarant" exception to the hearsay rule set forth in California Evidence Code section 1350. However, Carrick's invocation of his Fifth Amendment privilege does not make him "unavailable" under the statute, which requires that "the declarant's unavailability… is the result of the death by homicide or kidnapping of the declarant." Cal. Evid. Code section 1350(a)(1). Assuming <u>arguendo</u> this argument is not procedurally barred, petitioner has not shown deficient performance under <u>Strickland</u> on this basis.

At the evidentiary hearing, petitioner did not supply any new evidence that he spoke to Carrick at 11:14 a.m. on the morning of the shooting. At best, Clark could have introduced phone records at trial showing that an unknown person called Carrick at that time. Petitioner testified at trial that Carrick called him around 11:15 a.m., which does not correspond to the <u>incoming</u> call to Carrick at 11:14 a.m. For his part, Carrick was vague on the timing of petitioner's call but stated in 2006 that he believed it occurred close to noon, when school let out. Even if Clark had shown that petitioner spoke to Carrick at 11:14 a.m., there was no corroborating evidence that petitioner spoke to Michaud at 10:30 a.m. (as discussed above), such that petitioner would be precluded from the alleged 47-minute round trip to the Treasure Lane house. Based on the foregoing, petitioner has not shown deficient performance or prejudice as to Claim 6(h).

(1-ER-25–28.)

## 1. The New-Facts-Based Claim is Procedurally Barred

Petitioner reraises his claim from the post-evidentiary hearing briefing that Clark was ineffective for failing to ask Carrick whether he would invoke

his right to remain silent with regards to whether Petitioner called him at 11:14 AM. (1-ER-211–12.) The claim was never presented to any court prior to this Court's remand for the evidentiary hearing. The Magistrate Judge found this claim procedurally barred and outside the scope of the remand. (1-ER-11.) This Court should as well.

Petitioner previously asserted Carrick's invocation actually made him unavailable to testify. (1-SER-3–5.) I.e., he conceded the facts were such that Carrick's invocation was valid. He cannot argue now that the true facts are otherwise. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 n.6 (2013) (citing, inter alia, *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.")). And as an independent point, only after the evidentiary hearing went poorly for him did Petitioner try to claim advance the contradictory theory that any competent counsel would have sought to invalidate the claim of privilege. (1-ER-208– 14.) Because the claim is outside the scope of this Court's remand, it is barred from consideration. *United States v. Crooked Arm*, 853 F.3d 1065, 1069 (9th Cir. 2017) (district court precluded from evaluating claims outside

the scope of remand); *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172–73 (9th Cir. 2006) (collecting cases).

### 2. The Claims Are Meritless

As described by the Magistrate Judge, Petitioner failed to introduce any additional evidence at the evidentiary hearing that supported Petitioner's alibi. The only admissible evidence Petitioner produced was Carrick's phone record which showed an incoming call from an unknown number at 11:14 AM. This did not support Petitioner's trial testimony that Carrick *called Petitioner* at that time. Thus, Petitioner failed to show that trial counsel performed ineffectively in regards to the 11:14 AM call.

Apparently acknowledging the issue, Petitioner claims defense counsel could have had Carrick testify. (AOB-42–44.) That argument is barred procedurally, as described above, and meritless.

Defense counsel could not have speculated away Carrick's privilege. Worse, as noted, even the opening brief's assumption tends only to confirm that Carrick's assertion could not be overcome.

Petitioner takes the extremely narrow view that Carrick would only have to testify that a call was made. (AOB-43–44.) Again, his position is contrary to law. Any testimony on the subject of the call would have opened Carrick up to cross-examination about the nature of the call and discussion

he had with Petitioner. This is because "[a] witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry." *Mitchell v. U.S.*, 526 U.S. 314, 321–22 (1999). "[A] contrary rule would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony." *Id*.

Petitioner also claims that counsel should have admitted Carrick's pretrial statements to police through Detective Hoagland. He fails to proffer any theory that such hearsay statements were admissible. *See* Cal. Evid. Code § 1200. Thus he failed to carry his burden to demonstrate admissible evidence was available to trial counsel.

### E. Demonstrating That Carrick Obtained Money from Petitioner's Mother's ATM Account Would Not Have Changed the Outcome at Trial

Defense counsel admitted evidence at trial that Carrick stole money from Petitioner's mother's ATM account and used this money to purchase marijuana with Petitioner after the robbery. Petitioner claims defense counsel should have admitted evidence of additional withdrawals made from Petitioner's mother's account by Carrick shortly before the robbery. (AOB-49–50.)

43

The evidence would not have changed the outcome at trial. Additional evidence that Carrick stole money to buy marijuana does not demonstrate how Petitioner came up with a large sum of money the day of the robbery. Counsel was not ineffective for failing to admit cumulative, unhelpful evidence.

The Magistrate Judge summarized the claim and relevant background in denying Petitioner's claim:

> Jessie Pine, who lived at the Treasure Lane House with Kyle Smelser, testified at trial that he used and sold marijuana. (4 RT 907-908.) Pine testified that Frankie Silici had purchased marijuana from him and brought petitioner with him to the Treasure Lane House. (4 RT 909-910; see also 3 RT 539 (Silici's testimony that petitioner accompanied him to the Treasure Lane House to purchase marijuana "a couple of times")). Pine testified that, on February 26, 2003, he came home to find Kyle Smelser dead of a gunshot wound and his (Pine's) bedroom door open, with a box missing from his dresser drawer that had contained about $3,000 in cash. (4 RT 9140916.) Pine testified that he knew the amount because he counted the cash on a daily basis and used it to buy large amounts of marijuana. (4 RT 916.)
>
> At trial, petitioner testified that, on the afternoon of the murder, he, Carrick, and a third person purchased $2,000 worth of marijuana from Carrick's cousin, Nate McKelvie. (6 RT 1286.) Petitioner testified that he supplied $800, which he had acquired from "selling pot," and Carrick supplied the other $1,200. (6 RT 1286.)
>
> One issue at trial was how petitioner acquired the cash to buy marijuana that afternoon. As recounted in the state court of appeal's decision summarized above, petitioner's friend Richard Anschutz testified that when he spoke to petitioner by phone at

11:34 a.m. that morning, petitioner said he had $2,500 to buy marijuana but didn't want to discuss where he got the money over the phone. (ECF No. 16-1 at 14.) Petitioner's friend Cliff Sargent testified that, while he was at petitioner's house on the afternoon of the shooting, petitioner "showed me a big wad of money… a wad of cash." (3 RT 725-726.)

> Q: Did Mr. O'Brien tell you how he got that money?
>
> A: Yeah, but I thought he was joking.
>
> Q: Okay. I understand you thought he was joking, but what did he tell you about how he got the money?
>
> A: I'm sorry. I asked how he got the money. And, joking around, he said he killed somebody for it. And I laughed.
>
> Q: You thought it was a stupid joke?
>
> A: I wouldn't believe any of my friends if they said it.
>
> Q: All right. And you didn't believe Mr. O'Brien when he said it?
>
> A: No.
>
> Q: Was he laughing?
>
> A: No. It wasn't like hysterical or nothing. Just a little comment.
>
> Q: Other than that, did he tell you how he got the money?
>
> A: No.

(3 RT 726.) The prosecutor argued that petitioner had acquired the cash from the Treasure Lane House. (7 RT 1683-1684.)

An alternative theory was that petitioner had acquired the money from selling drugs and/or unauthorized withdrawals from his mother's bank account. Petitioner testified that, on multiple occasions earlier that month, he had used his mother's ATM card

to withdraw a total of $1,400 from her account. (6 RT 1287.)
Deborah O'Brien testified that petitioner admitted to her in March
2003 that he had made multiple unauthorized withdrawals from
her ATM account in the past few weeks. (6 RT 1420-1421, 1425-
1426.)

Clark called Deputy Sheriff Paul Hadjes to testify that O'Brien
and Carrick both made withdrawals using Deborah O'Brien's
ATM card. (6 RT 1453-1455.) The jury heard the following
stipulation: "Detective Hadjes, during the course of his
investigation of this case, spoke to one Michael Carrick. During
the course of an interview with Mr. Carrick, Mr. Carrick admitted
that he had some responsibility for using Debbie O'Brien's ATM
card. However, he indicated that he was given the PIN number of
Ms. O'Brien and the card by one Sean O'Brien, and he made
various ATM withdrawals over the course of the month of
February and of March." (6 RT 1455.) The parties further
stipulated that there was a photo of Carrick withdrawing money
from the ATM at 8:14 a.m. on February 26, 2003, the morning of
the shooting. (6 RT 1455-1465.) Detective Hadjes testified that
Carrick withdrew $500 that day and also withdrew $500 on
February 12, 2003. (6 RT 1456-1457.)

At the evidentiary hearing, the parties stipulated: "Information
was available at trial that Mike Carrick made unauthorized
withdrawals from Deborah O'Brien's bank account on February
24th and 25th of 2003. Each of these withdrawals was for $500."
(ECF No. 82, EHRT 4.)

Petitioner argues that Clark was ineffective in failing to show that
Carrick made additional withdrawals from Debbie O'Brien's
account in February, which would show how he contributed
$1,200 to the marijuana purchase on the day of the shooting.
Even if additional evidence of Carrick's ATM withdrawals had
been adduced, however, it would not have accounted for
petitioner's reported "wad of cash" that afternoon, his statements
to Anschutz, and his self-professed contribution of $800 to the
marijuana purchase. The jury heard that Carrick knew Deborah
O'Brien's pin number, had access to her bank account, and had

46

> withdrawn money from it multiple times; thus, there was evidence
> to support a reasonable belief that Carrick supplied $1,200 for the
> marijuana purchase, as petitioner claimed. On the other hand,
> there was evidence to support the conclusion that petitioner
> acquired the cash for the drug purchase from his robbery of the
> Treasure Lane house earlier that day. Petitioner has not shown
> deficient performance or prejudice as to Claim 6(m).

(1-ER-28-31.)

Petitioner attempts to confuse the issue. He argues that the evidence of

additional withdrawals would have corroborated where Carrick got his

money for the marijuana purchase. (AOB-50.) But, as the Magistrate Judge

noted, the evidence of guilt was not the money *Carrick* contributed, but

rather the money *Petitioner* contributed to the marijuana purchase.

Logically, showing that one party to a marijuana purchase (Carrick) obtained

his part of the purchase funds through illegal means has no tendency in

reason to show that the other party (Petitioner) did *not* obtain his part of the

purchase funds through illegal means.

Because the additional evidence of how Carrick came up with money

for the marijuana purchase would not have changed the outcome at trial,

counsel's failure to present it was not ineffective assistance. *Cunningham v.*

*Wong*, 704 F.3d 1143, 1162–63 (9th Cir. 2013) (counsel's failure to present

cumulative evidence neither deficient nor prejudicial).

47

# CONCLUSION

The district court judgment should be affirmed.

Dated: September 21, 2022    Respectfully submitted,

ROB BONTA
Attorney General of California
MICHAEL P. FARRELL
Senior Assistant Attorney General
DAVID ANDREW ELDRIDGE
Deputy Attorney General


/S/ *MAX FEINSTAT*
MAX FEINSTAT
Deputy Attorney General
*Attorneys for Respondent-Appellee*

SA2022301671
36566513.docx

48

20-16970

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**SEAN ALAN O'BRIEN,**

                    Petitioner-Appellant,

**v.**

**LELAND MCEWEN, Warden, Calipatria State Prison,**

                    Respondent-Appellee.

---

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated:  September 21, 2022          Respectfully submitted,

                              ROB BONTA
                              Attorney General of California
                              MICHAEL P. FARRELL
                              Senior Assistant Attorney General
                              DAVID ANDREW ELDRIDGE
                              Deputy Attorney General


                              /S/ *MAX FEINSTAT*
                              MAX FEINSTAT
                              Deputy Attorney General
                              *Attorneys for Respondent-Appellee*

49

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-16970

I am the attorney or self-represented party.

**This brief contains** | 12,685 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s Max Feinstat    **Date** | Sep 21, 2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/2018*